# MATHEWS, SECRETARY OF HEALTH, EDUCATION, AND WELFARE *v.* LUCAS ET AL.

No. 75–88.  Argued January 13, 1976—Decided June 29, 1976

496

Blackmun, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, White, Powell, and Rehnquist, JJ., joined. Stevens, J., filed a dissenting opinion, in which Brennan and Marshall, JJ., joined, *post*, p. 516.

*Deputy Solicitor General Jones* argued the cause for appellant. On the brief were *Solicitor General Bork, Assistant Attorney General Lee,* and *William Kanter.*

*C. Christopher Brown* argued the cause for appellees. On the brief was *Thomas W. Pearlman.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the issue of the constitutionality, under the Due Process Clause of the Fifth Amendment, of those provisions of the Social Security Act that condition the eligibility of certain illegitimate children for a surviving child's insurance benefits upon a showing that the deceased wage earner was the claimant child's parent and, at the time of his death, was living with the child or was contributing to his support.

## I

Robert Cuffee, now deceased, lived with Belmira Lucas during the years 1948 through 1966, but they were never married. Two children were born to them during these years: Ruby M. Lucas, in 1953, and Darin E. Lucas, in 1960. In 1966 Cuffee and Lucas separated. Cuffee died in Providence, R. I., his home, in 1968. He died without ever having acknowledged in writing his paternity of either Ruby or Darin, and it was never determined in any judicial proceeding during his lifetime that he was the father of either child. After Cuffee's death, Mrs. Lucas filed an application on behalf of Ruby and Darin for surviving children's benefits under § 202 (d)(1) of the Social Security Act, 70 Stat. 807, as amended, 42 U. S. C. § 402 (d)(1) (1970 ed. and Supp. IV), based upon Cuffee's earnings record.

## II

In operative terms, the Act provides that an unmarried son or daughter of an individual, who died fully or currently insured under the Act, may apply for and be

entitled to a survivor's benefit, if the applicant is under 18 years of age at the time of application (or is a full-time student and under 22 years of age) and was dependent, within the meaning of the statute, at the time of the parent's death.[1] A child is' considered dependent for this purpose if the insured father was living with or contributing to the child's support at the time of death. Certain children, however, are relieved of the burden of such individualized proof of dependency. Unless the child has been adopted by some other individual, a child

---

[1] Section 202 (d) (1) of the Act, as set forth in 42 U. S. C. § 402 (d) (1), provides in pertinent part:

"Every child (as defined in section 416 (e) of this title) . . . of an individual who dies a fully or currently insured individual, if such child—

"(A) has filed application for child's insurance benefits,

"(B) at the time such application was filed was unmarried and (i) either had not attained the age of 18 or was a full-time student and had not attained the age of 22 . . . and

"(C) was dependent upon such individual—

. . . . .

"(ii) if such individual has died, at the time of such death, . . .

. . . . .

"shall be entitled to a child's insurance benefit for each month, beginning with the first month after August 1950 in which such child becomes so entitled to such insurance benefits . . . ."

Section 216 (e), 42 U. S. C. § 416 (e), includes, under the definition of child, *inter alia*, "the child . . . of an individual," certain legally adopted children, certain stepchildren, and certain grandchildren and stepgrandchildren. Additionally, § 216 (h) (2) (A) of the Act, 42 U. S. C. § 416 (h) (2) (A), provides:

"In determining whether an applicant is the child . . . of a fully or currently insured individual for purposes of this subchapter, the Secretary shall apply such law as would be applied in determining the devolution of intestate personal property . . . by the courts of the State in which [such insured individual] was domiciled at the time of his death . . . . Applicants who according to such law would have the same status relative to taking intestate personal property as a child . . . shall be deemed such."

who is legitimate, or a child who would be entitled to inherit personal property from the insured parent's estate under the applicable state intestacy law, is considered to have been dependent at the time of the parent's death.[2] Even lacking this relationship under state law, a child, unless adopted by some other individual, is entitled to a presumption of dependency if the decedent, before death, (a) had gone through a marriage ceremony with the other parent, resulting in a purported marriage between them which, but for a nonobvious legal defect, would have been valid, or (b) in writing had acknowledged the child to be his, or (c) had been decreed by a court to be the child's father, or (d) had been ordered by a court to support the child because the child was his.[3]

---

[2] Section 202 (d)(3) of the Act, 42 U. S. C. § 402 (d)(3), provides in pertinent part:

"A child shall be deemed dependent upon his father or adopting father or his mother or adopting mother at the time specified in paragraph (1)(C) of this subsection unless, at such time, such individual was not living with or contributing to the support of such child and—

"(A) such child is neither the legitimate nor adopted child of such individual, or

"(B) such child has been adopted by some other individual."

Additionally, any child who qualifies under § 216 (h)(2)(A), see n. 1, *supra*, is considered legitimate for § 202 (d)(3) purposes, and thus dependent.

[3] Section 202 (d)(3), as set forth in 42 U. S. C. § 402 (d)(3), provides in pertinent part that "a child deemed to be a child of a fully or currently insured individual pursuant to section 416 (h)(2)(B) or section 416 (h)(3) . . . shall be deemed to be the legitimate child of such individual," and therefore presumptively dependent. Section 216 (h)(2)(B), as set forth in 42 U. S. C. § 416 (h)(2)(B), provides:

"If an applicant is a son or daughter of a fully or currently insured individual but is not (and is not deemed to be) the child of such insured individual under subparagraph (A), such applicant shall nevertheless be deemed to be the child of such insured individual if

An Examiner of the Social Security Administration, after hearings, determined that while Cuffee's paternity was established, the children had failed to demonstrate their dependency by proof that Cuffee either lived with them or was contributing to their support at the time

such insured individual and the mother or father, as the case may be, of such applicant went through a marriage ceremony resulting in a purported marriage between them which, but for a legal impediment described in the last sentence of paragraph (1)(B), would have been a valid marriage."

The specified last sentence of § 216 (h)(1)(B), 42 U. S. C. § 416 (h)(1)(B), in turn, refers only to

"an impediment (i) resulting from the lack of dissolution of a previous marriage or otherwise arising out of such previous marriage or its dissolution, or (ii) resulting from a defect in the procedure followed in connection with such purported marriage."

Section 216 (h)(3), as set forth in 42 U. S. C. § 416 (h)(3), provides:

"An applicant who is the son or daughter of a fully or currently insured individual, but who is not (and is not deemed to be) the child of such insured individual under paragraph (2) of this subsection, shall nevertheless be deemed to be the child of such insured individual if:

. . . .

"(C) In the case of a deceased individual—

"(i) such insured individual—

"(I) had acknowledged in writing that the applicant is his son or daughter,

"(II) had been decreed by a court to be the father of the applicant, or

"(III) had been ordered by a court to contribute to the support of the applicant because the applicant was his son or daughter,

"and such acknowledgment, court decree, or court order was made before the death of such individual, or

"(ii) such insured individual is shown by evidence satisfactory to the Secretary to have been the father of the applicant, and such insured individual was living with or contributing to the support of the applicant at the time such insured individual died."

of his death, or by any of the statutory presumptions of dependency, and thus that they were not entitled to survivorship benefits under the Act. The Appeals Council of the Social Security Administration affirmed these rulings, and they became the final decision of the Secretary of Health, Education, and Welfare. Lucas then timely filed this action, pursuant to § 205 (g) of the Act, 42 U. S. C. § 405 (g), in the United States District Court for the District of Rhode Island on behalf of the two children (hereinafter sometimes called the appellees) for review of the Secretary's decision.

The District Court ultimately affirmed each of the factual findings of the administrative agency: that Robert Cuffee was the children's father; that he never acknowledged his paternity in writing; that his paternity or support obligations had not been the subject of a judicial proceeding during his lifetime; that no common-law marriage had ever been contracted between Cuffee and Lucas, so that the children could not inherit Cuffee's personal property under the intestacy law of Rhode Island; and that, at the time of his death, he was neither living with the children nor contributing to their support. 390 F. Supp. 1310, 1312–1314 (1975). None of these factual matters is at issue here.[4]

---

[4] Upon the original petition for review under § 205 (g), the District Court affirmed the administrative findings that had then been made, but remanded the case to the Secretary for him to determine the common-law status of the relationship between the children's parents, a question left unconsidered in the first administrative proceeding. After an adverse determination on this point and an unsuccessful administrative appeal, Lucas, on behalf of the children, again timely sought review in the District Court, presenting the common-law marriage question and asserting a constitutional challenge to the Act. The District Court affirmed the administrative conclusion of no common-law marriage, and then turned to the constitutional questions that are the subject of this appeal.

A motion for summary judgment, filed by the appellees, relied on *Jimenez* v. *Weinberger,* 417 U. S. 628 (1974). It was urged that denial of benefits in this case, where paternity was clear, violated the Fifth Amendment's Due Process Clause, as that provision comprehends the principle of equal protection of the laws,[5] because other children, including all legitimate children, are statutorily entitled, as the Lucas children are not, to survivorship benefits regardless of actual dependency. Addressing this issue, the District Court ruled that the statutory classifications were constitutionally impermissible.[6] 390 F. Supp., at 1314–1321. Recognizing that the web of statutory provisions regarding presumptive dependency was overinclusive because it entitled some children, who were not actually dependent, to survivorship benefits under the Act—although not underinclusive, since no otherwise eligible child who could establish actual dependency at the time of death was denied such benefits—the court concluded that the Act was *not* intended merely to replace actual support that a child lost through the death of the insured parent. *Id.,* at 1319–1320. Rather, the court characterized the statute as one designed to replace obligations of support or potential

---

[5] See, *e. g., Jimenez* v. *Weinberger,* 417 U. S., at 637; *United States Dept. of Agriculture* v. *Moreno,* 413 U. S. 528, 533 n. 5 (1973); *Frontiero* v. *Richardson,* 411 U. S. 677, 680 n. 5 (1973) (plurality opinion).

[6] The District Court affirmed the Secretary's factual findings in a "Memorandum and Order" entered August 30, 1974. Viewing the constitutional claim as one requiring the convention of a three-judge district court under 28 U. S. C. §§ 2282 and 2284, the single District Judge did not reach that issue. A three-judge District Court was convened, but disbanded when appellees' renewed motion for summary judgment omitted their earlier request for injunctive relief. The constitutional claim thus was correctly determined by a single District Judge.

support lost through death, where the obligation was perceived by Congress, on the basis of the responsibility of the relation between the child's parents, to be a valid one. Thus, the court concluded:

> "[The Act] conditions eligibility on the basis of Congress' views as to who is entitled to support and reflects society's view that legitimate and 'legitimated' children are more entitled to support by or through a parent than are illegitimate children. But this is *not* a legitimate governmental interest, and thus cannot support the challenged classification. *Gomez* v. *Perez,* [409 U. S. 535 (1973)]." *Id.,* at 1320. (Emphasis in original.)

With this conclusion, the District Court reversed the administrative decision and ordered the Secretary to pay benefits for both children. Jurisdictional Statement 28a.

The Secretary appealed directly to this Court. 28 U. S. C. § 1252. We noted probable jurisdiction and set the case for argument with *Norton* v. *Mathews, post,* p. 524. 423 U. S. 819 (1975).

### III

The Secretary does not disagree that the Lucas children and others similarly circumstanced are treated differently, as a class, from those children—legitimate and illegitimate—who are relieved by statutory presumption of any requirement of proving actual dependency at the time of death through cohabitation or contribution: for children in the advantaged classes may be statutorily entitled to benefits even if they have never been dependent upon the father through whom they claim.[7] Statutory

---

[7] It adds nothing to say that the illegitimate child is also saddled with the procedural burden of proving entitlement on the basis of facts the legitimate child need not prove. The legitimate child is re-

classifications, of course, are not *per se* unconstitutional; the matter depends upon the character of the discrimination and its relation to legitimate legislative aims. "The essential inquiry . . . is . . . inevitably a dual one: What legitimate [governmental] interest does the classification promote? What fundamental personal rights might the classification endanger?" *Weber* v. *Aetna Casualty & Surety Co.*, 406 U. S. 164, 173 (1972).

Although the District Court concluded that close judicial scrutiny of the statute's classifications was not necessary to its conclusion invalidating those classifications, it also concluded that legislation treating legitimate and illegitimate offspring differently is constitutionally suspect,[8] 390 F. Supp., at 1318–1319, and requires the judicial scrutiny traditionally devoted to cases involving discrimination along lines of race[9] or national origin.[10] Appellees echo this approach. We disagree.[11]

quired, like the illegitimate, to prove the facts upon which his statutory entitlement rests.

[8] Appellees do not suggest, nor could they successfully, that strict judicial scrutiny of the statutory classifications is required here because, in regulating entitlement to survivorship benefits, the statute discriminatorily interferes with interests of constitutional fundamentality. *Weinberger* v. *Salfi*, 422 U. S. 749, 768–770 (1975); *Dandridge* v. *Williams*, 397 U. S. 471 (1970).

The Court, of course, has found the privacy of familial relationships to be entitled to procedural due process protections from disruption by the State, whether or not those relationships were legitimized by marriage under state law. *Stanley* v. *Illinois*, 405 U. S. 645 (1972). But the concerns relevant to that context are only tangential to the analysis here, since the statutory scheme does not interfere in any way with familial relations.

[9] See *Loving* v. *Virginia*, 388 U. S. 1, 11 (1967); *Bolling* v. *Sharpe*, 347 U. S. 497 (1954).

[10] See *Oyama* v. *California*, 332 U. S. 633, 644–646 (1948); *Korematsu* v. *United States*, 323 U. S. 214, 216 (1944); *Hirabayashi* v. *United States*, 320 U. S. 81, 100 (1943).

[11] That the statutory classifications challenged here discriminate

It is true, of course, that the legal status of illegitimacy, however defined, is, like race or national origin, a characteristic determined by causes not within the control of the illegitimate individual, and it bears no relation to the individual's ability to participate in and contribute to society. The Court recognized in *Weber* that visiting condemnation upon the child in order to express society's disapproval of the parents' liaisons

> "is illogical and unjust. Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as an unjust—way of deterring the parent." 406 U. S., at 175. (Footnote omitted.)

But where the law is arbitrary in such a way, we have had no difficulty in finding the discrimination impermissible on less demanding standards than those advocated here. *New Jersey Welfare Rights Org.* v. *Cahill,* 411 U. S. 619 (1973); *Richardson* v. *Davis,* 409 U. S. 1069 (1972); *Richardson* v. *Griffin,* 409 U. S. 1069 (1972); *Weber, supra; Levy* v. *Louisiana,* 391 U. S. 68 (1968). And such irrationality in some classifications does not in itself demonstrate that other, possibly rational, distinctions made in part on the basis of legitimacy are inherently untenable. Moreover, while the law has long

---

among illegitimate children does not mean, of course, that they are not also properly described as discriminating between legitimate and illegitimate children. See *Frontiero* v. *Richardson, supra;* cf. *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164, 169, 172 (1972). In view of our conclusion regarding the applicable standard of judicial scrutiny, we need not consider how the classes of legitimate and illegitimate children would be constitutionally defined under appellees' approach.

placed the illegitimate child in an inferior position relative to the legitimate in certain circumstances, particularly in regard to obligations of support or other aspects of family law, see generally, *e. g.*, H. Krause, Illegitimacy: Law and Social Policy 21–42 (1971); Gray & Rudovsky, The Court Acknowledges the Illegitimate: *Levy v. Louisiana* and *Glona v. American Guarantee & Liability Insurance Co.*, 118 U. Pa. L. Rev. 1, 19–38 (1969), perhaps in part because the roots of the discrimination rest in the conduct of the parents rather than the child,[12] and perhaps in part because illegitimacy does not carry an obvious badge, as race or sex do, this discrimination against illegitimates has never approached the severity or pervasiveness of the historic legal and political discrimination against women and Negroes. See *Frontiero* v. *Richardson,* 411 U. S. 677, 684–686 (1973) (plurality opinion).

We therefore adhere to our earlier view, see *Labine* v. *Vincent,* 401 U. S. 532 (1971), that the Act's discrimination between individuals on the basis of their legitimacy does not "command extraordinary protection from the majoritarian political process," *San Antonio School Dist.* v. *Rodriguez,* 411 U. S. 1, 28 (1973), which our most exacting scrutiny would entail.[13] See *Jimenez,* 417 U. S., at 631–634, 636; *Weber,* 406 U. S., at 173, 175–176.

---

[12] The significance of this consideration would seem to be suggested by provisions enabling the parents to legitimatize children born illegitimate. Compare *Weber,* 406 U. S., at 170–171, with *Labine* v. *Vincent,* 401 U. S. 532, 539 (1971). Of course, the status of "dependency" as recognized by the statute here is wholly within the control of the parent.

[13] In *Rodriguez* the Court identified a "suspect class" entitled to the protections of strict judicial scrutiny as one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." 411 U. S., at 28.

## IV

Relying on *Weber,* the Court, in *Gomez* v. *Perez,* 409 U. S. 535, 538 (1973), held that "once a State posits a judicially enforceable right on behalf of children to needed support from their natural fathers there is no constitutionally sufficient justification for denying such an essential right to a child simply because its natural father has not married its mother." The same principle, which we adhere to now, applies when the judicially enforceable right to needed support lies against the Government rather than a natural father. See *New Jersey Welfare Rights Org.* v. *Cahill, supra.*

Consistent with our decisions, the Secretary explains the design of the statutory scheme assailed here as a program to provide for all children of deceased insureds who can demonstrate their "need" in terms of dependency at the times of the insureds' deaths. Cf. *Jimenez,* 417 U. S., at 634. He authenticates this description by reference to the explicit language of the Act specifying that the applicant child's classification as legitimate, or acknowledged, etc., is ultimately relevant only to the determination of dependency, and by reference to legislative history indicating that the statute was not a general welfare provision for legitimate or otherwise "approved" children of deceased insureds, but was intended just "to replace the support lost by a child when his father . . . dies . . . ." S. Rep. No. 404, 89th Cong., 1st Sess., 110 (1965).

Taking this explanation at face value, we think it clear that conditioning entitlement upon dependency at the time of death is not impermissibly discriminatory in providing only for those children for whom the loss of the parent is an immediate source of the need. Cf. *Geduldig* v. *Aiello,* 417 U. S. 484, 492–497 (1974); *Jefferson* v. *Hackney,* 406 U. S. 535 (1972); *Richardson* v. *Belcher,*

404 U. S. 78 (1971). See also *Weber,* 406 U. S., at 174–175.

But appellees contend that the actual design of the statute belies the Secretary's description, and that the statute was intended to provide support for insured decedents' children generally, if they had a "legitimate" claim to support, without regard to actual dependency at death; in any case, they assert, the statute's matrix of classifications bears no adequate relationship to actual dependency at death. Since such dependency does not justify the statute's discriminations, appellees argue, those classifications must fall under *Gomez* v. *Perez, supra.* These assertions are in effect one and the same.[14] The basis for appellees' argument is the obvious fact that

---

[14] We are not bound to agree with the Secretary's description of the legislative design if the legislative history and the structure of the provisions themselves belie it. *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 648 n. 16 (1975); *Jimenez* v. *Weinberger,* 417 U. S., at 634. Appellees are unable, however, to summon any meaningful legislative history to support their position regarding the congressional design. They rely largely upon a section of the House-Senate Conference Committee Report on the 1965 Amendments to the Social Security Act, reproduced at 111 Cong. Rec. 18383 (1965), partially explaining, *id.,* at 18387, the addition of § 216 (h) (3), set forth in n. 3, *supra,* to the Act:

"A child would be paid benefits based on his father's earnings without regard to whether he has the status of a child under State inheritance laws if the father was supporting the child or had a legal obligation to do so."

But the clause's reference to legal obligations to support hardly establishes that the statute was designed to replace any potential source of lifetime support; in our view the passage appears only to be a partial description of the actual effect of §§ 416 (h) (3) (C) (i) (II) and (III), set forth in n. 3, *supra,* not an enunciation of the general purpose of the Act.

Thus, appellees, in order to make their case, must ultimately rely upon the asserted failure of the legislative product adequately to fit the purported legitimate aim.

each of the presumptions of dependency renders the class of benefit-recipients incrementally overinclusive, in the sense that some children within each class of presumptive dependents are automatically entitled to benefits under the statute although they could not in fact prove their economic dependence upon insured wage earners at the time of death. We conclude that the statutory classifications are permissible, however, because they are reasonably related to the likelihood of dependency at death.

### A

Congress' purpose in adopting the statutory presumptions of dependency was obviously to serve administrative convenience. While Congress was unwilling to assume that every child of a deceased insured was dependent at the time of death, by presuming dependency on the basis of relatively readily documented facts, such as legitimate birth, or existence of a support order or paternity decree, which could be relied upon to indicate the likelihood of continued actual dependency, Congress was able to avoid the burden and expense of specific case-by-case determination in the large number of cases where dependency is objectively probable. Such presumptions in aid of administrative functions, though they may approximate, rather than precisely mirror, the results that case-by-case adjudication would show, are permissible under the Fifth Amendment, so long as that lack of precise equivalence does not exceed the bounds of substantiality tolerated by the applicable level of scrutiny. See *Weinberger* v. *Salfi,* 422 U. S. 749, 772 (1975).[15]

In cases of strictest scrutiny, such approximations must be supported at least by a showing that the Govern-

---

[15] That these provisions may thus reflect a "secondary" purpose of Congress is, of course, of no moment. *McGinnis* v. *Royster,* 410 U. S. 263, 274–277 (1973).

ment's dollar "lost" to overincluded benefit recipients is returned by a dollar "saved" in administrative expense avoided. *Frontiero* v. *Richardson,* 411 U. S., at 689 (plurality opinion). Under the standard of review appropriate here, however, the materiality of the relation between the statutory classifications and the likelihood of dependency they assertedly reflect need not be " 'scientifically substantiated.' " *James* v. *Strange,* 407 U. S. 128, 133 (1972), quoting *Roth* v. *United States,* 354 U. S. 476, 501 (1957) (opinion of Harlan, J.). Nor, in any case, do we believe that Congress is required in this realm of less than strictest scrutiny to weigh the burdens of administrative inquiry solely in terms of dollars ultimately "spent," ignoring the relative amounts devoted to administrative rather than welfare uses. Cf. *Weinberger* v. *Salfi,* 422 U. S., at 784. Finally, while the scrutiny by which their showing is to be judged is not a toothless one, *e. g., Jimenez* v. *Weinberger,* 417 U. S. 628 (1974); *Frontiero* v. *Richardson,* 411 U. S., at 691 (STEWART, J., concurring in judgment, POWELL, J., concurring in judgment); *Reed* v. *Reed,* 404 U. S. 71 (1971), the burden remains upon the appellees to demonstrate the insubstantiality of that relation. See *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78–79 (1911); cf. *United States* v. *Gainey,* 380 U. S. 63, 67 (1965).

B

Applying these principles, we think that the statutory classifications challenged here are justified as reasonable empirical judgments that are consistent with a design to qualify entitlement to benefits upon a child's dependency at the time of the parent's death. To begin with, we note that the statutory scheme is significantly different from the provisions confronted in cases in which the

Court has invalidated legislative discriminations among children on the basis of legitimacy. See *Gomez* v. *Perez,* 409 U. S. 535 (1973); *New Jersey Welfare Rights Org.* v. *Cahill,* 411 U. S. 619 (1973); *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972); *Levy* v. *Louisiana,* 391 U. S. 68 (1968). These differences render those cases of little assistance to appellees. It could not have been fairly argued, with respect to any of the statutes struck down in those cases, that the legitimacy of the child was simply taken as an indication of dependency, or of some other valid ground of qualification. Under all but one of the statutes, not only was the legitimate child automatically entitled to benefits, but an illegitimate child was denied benefits solely and finally on the basis of illegitimacy, and regardless of any demonstration of dependency or other legitimate factor. See also *Griffin* v. *Richardson,* 346 F. Supp. 1226 (Md.), summarily aff'd, 409 U. S. 1069 (1972); *Davis* v. *Richardson,* 342 F. Supp. 588 (Conn.), summarily aff'd, 409 U. S. 1069 (1972). In *Weber* v. *Aetna Casualty & Surety Co., supra,* the sole partial exception, the statutory scheme provided for a child's equal recovery under a workmen's compensation plan in the event of the death of the father, not only if the child was dependent, but *also* only if the dependent child was legitimate. 406 U. S., at 173–174, and n. 12. *Jimenez* v. *Weinberger, supra,* invalidating discrimination among afterborn illegitimate children as to entitlement to a child's disability benefits under the Social Security Act, is similarly distinguishable. Under the somewhat related statutory matrix considered there, legitimate children and those capable of inheriting personal property under state intestacy law, and those illegitimate solely on account of a nonobvious defect in their parents' marriage, were eligible for benefits, even if they were born after the onset of the father's disability.

Other (illegitimate) afterborn children were conclusively denied any benefits, regardless of any showing of dependency. The Court held the discrimination among illegitimate afterborn children impermissible, rejecting the Secretary's claim that the classification was based upon considerations regarding trustworthy proof of dependency, because it could not accept the assertion:

> "[T]he blanket and conclusive exclusion of appellants' subclass of illegitimates is reasonably related to the prevention of spurious claims [of dependency]. Assuming that the appellants are in fact dependent on the claimant [father], it would not serve the purposes of the Act to conclusively deny them an opportunity to establish their dependency and their right to insurance benefits." 417 U. S., at 636.

Hence, it was held that

> "to conclusively deny one subclass benefits presumptively available to the other denies the former the equal protection of the laws guaranteed by the due process provision of the Fifth Amendment." *Id.*, at 637.

See also *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 645 (1975); cf. *Labine* v. *Vincent,* 401 U. S., at 539. But this conclusiveness in denying benefits to some classes of afterborn illegitimate children, which belied the asserted legislative reliance on dependency in *Jimenez,* is absent here, for, as we have noted, any otherwise eligible child may qualify for survivorship benefits by showing contribution to support, or cohabitation, at the time of death. Cf. *Vlandis* v. *Kline,* 412 U. S. 441, 452–453, n. 9 (1973), distinguishing *Starns* v. *Malkerson,* 326 F. Supp. 234 (Minn. 1970), summarily aff'd, 401 U. S. 985 (1971).

It is, of course, not enough simply that any child of a deceased insured is eligible for benefits upon *some* show-

ing of dependency. In *Frontiero* v. *Richardson, supra,* we found it impermissible to qualify the entitlement to dependent's benefits of a married woman in the uniformed services upon an individualized showing of her husband's actual dependence upon her for more than half his income, when no such showing of actual dependency was required of a married man in the uniformed services to obtain dependent's benefits on account of his wife. The invalidity of that gender-based discrimination rested upon the "overbroad" assumption, *Schlesinger* v. *Ballard,* 419 U. S. 498, 508 (1975), underlying the discrimination "that male workers' earnings are vital to the support of their families, while the earnings of female wage earners do not significantly contribute to their families' support." *Weinberger* v. *Wiesenfeld,* 420 U. S., at 643; see *Frontiero,* 411 U. S., at 689 n. 23. Here, by contrast, the statute does not broadly discriminate between legitimates and illegitimates without more, but is carefully tuned to alternative considerations. The presumption of dependency is withheld only in the absence of any significant indication of the likelihood of actual dependency. Moreover, we cannot say that the factors that give rise to a presumption of dependency lack any substantial relation to the likelihood of actual dependency. Rather, we agree with the assessment of the three-judge court as it originally ruled in *Norton* v. *Weinberger,* 364 F. Supp. 1117, 1128 (Md. 1973): [16]

> "[I]t is clearly rational to presume the overwhelming number of legitimate children are actually dependent upon their parents for support. Likewise . . . the children of an invalid marriage . . .

---

[16] Vacated and remanded for further proceedings in light of *Jimenez,* 418 U. S. 902 (1972); adhered to on remand, 390 F. Supp. 1084 (1975); aff'd *sub nom. Norton* v. *Mathews, post,* p. 524.

would typically live in the wage earner's home or be supported by him. . . . When an order of support is entered by a court, it is reasonable to assume compliance occurred. A paternity decree, while not necessarily ordering support, would almost as strongly suggest support was subsequently obtained. Conceding that a written acknowledgment lacks the imprimatur of a judicial proceeding, it too establishes the basis for a rational presumption. Men do not customarily affirm in writing their responsibility for an illegitimate child unless the child is theirs and a man who has acknowledged a child is more likely to provide it support than one who does not."

Similarly, we think, where state intestacy law provides that a child may take personal property from a father's estate, it may reasonably be thought that the child will more likely be dependent during the parent's life and at his death.[17] For in its embodiment of the popular

---

[17] The Secretary, pointing out that § 202 (d)(3), as set forth in 42 U. S. C. § 402 (d)(3), in specific terms provides only that "a child deemed to be a child of a fully or currently insured individual pursuant to section 416 (h)(2)(B) or section 416 (h) (3) . . . shall be deemed to be the legitimate child of such individual," urges that we misconstrued the statute in *Jimenez*, 417 U. S., at 631 n. 2, in concluding that an applicant qualifying as a child under § 216 (h)(2)(A) is to be considered as a *legitimate* child and therefore dependent under § 202 (d)(3). We have no question, however, as to the correctness of that conclusion. First, it is only through operation of § 216 (h)(2)(A) that the recognition of "legitimacy" by state law under § 202 (d)(3)(A) as giving rise to a presumption of dependency takes on a consistent operational meaning. Second, §§ 216 (h)(2)(B) and (3) specifically exclude any child qualified under § 216 (h)(2)(A); if a § 216 (h) (2)(A) child were not considered legitimate under § 202 (d)(3), this would have the anomalous effect that an illegitimate child who had been acknowledged in a written statement by the in-

view within the jurisdiction of how a parent would have his property devolve among his children in the event of death, without specific directions, such legislation also reflects to some degree the popular conception within the jurisdiction of the felt parental obligation to such an "illegitimate" child in other circumstances, and thus something of the likelihood of actual parental support during, as well as after, life.[18]   Accord, *Watts* v. *Veneman*, 155 U. S. App. D. C. 84, 88, 476 F. 2d 529, 533 (1973).

To be sure, none of these statutory criteria compels the extension of a presumption of dependency.   But the constitutional question is not whether such a presumption is required, but whether it is permitted.   Nor, in ratifying these statutory classifications, is our role to hypothesize independently on the desirability or feasibility of any possible alternative basis for presumption.   These matters of practical judgment and empirical calculation are for Congress.   Drawing upon its own practical experi-

---

sured father, for example, would be deprived of otherwise established eligibility for benefits, see § 216 (h) (3) (C) (i) (I), if under applicable state law such an acknowledgment worked to make the child an intestate heir.   Moreover, the legislative history is clear that the Social Security Amendments of 1960, Pub. L. 86–778, 74 Stat. 924, §§ 208 (b) and (d), 42 U. S. C. § 408 (b) and (d), adding § 216 (h) (2) (B) to the Act and inserting the provision in § 202 (d) (3) specifying that a § 216 (h) (2) (B) child shall be deemed to be a legitimate, and therefore dependent, child for death benefit purposes, were intended to have the effect of deeming *any* § 216 (h) (2) child "legitimate" and thus "dependent."   See S. Rep. No. 1856, 86th Cong., 2d Sess., 78–79, 133 (1960) (discussing §§ 207 (b) and (d)); H. R. Rep. No. 1799, 86th Cong., 2d Sess., 91–92, 152 (1960).

[18] Appellees do not suggest, and we are unwilling to assume, that discrimination against children in appellees' class in state intestacy laws is constitutionally prohibited, see *Labine* v. *Vincent*, 401 U. S. 532 (1971), in which case appellees would be made eligible for benefits under § 216 (h) (2) (A).

ence, Congress has tailored statutory classifications in accord with its calculations of the likelihood of actual support suggested by a narrow set of objective and apparently reasonable indicators. Our role is simply to determine whether Congress' assumptions are so inconsistent or insubstantial as not to be reasonably supportive of its conclusions that individualized factual inquiry in order to isolate each nondependent child in a given class of cases is unwarranted as an administrative exercise. In the end, the precise accuracy of Congress' calculations is not a matter of specialized judicial competence; and we have no basis to question their detail beyond the evident consistency and substantiality. Cf. *United States* v. *Gainey,* 380 U. S., at 67. We cannot say that these expectations are unfounded, or so indiscriminate as to render the statute's classifications baseless. We conclude, in short, that, in failing to extend any presumption of dependency to appellees and others like them, the Act does not impermissibly discriminate against them as compared with legitimate children or those illegitimate children who are statutorily deemed dependent.

*Reversed.*

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

The reason why the United States Government should not add to the burdens that illegitimate children inevitably acquire at birth is radiantly clear: We are committed to the proposition that all persons are created equal. The Court's reason for approving discrimination against this class—"administrative convenience"—is opaque and insufficient: opaque because the difference between this justification and the argument rejected in *Jimenez* v. *Weinberger,* 417 U. S. 628, is so difficult to

discern; insufficient because it unfairly evaluates the competing interests at stake.

## I

*Jimenez* involved a requirement that the wage earner must have contributed to the support of his illegitimate child prior to the onset of his disability; this case involves the requirement that the deceased wage earner was contributing to the support of his illegitimate child at the time of his death. The critical objections to the classification held invalid in *Jimenez* apply with equal force in this case.

The classification in *Jimenez* was "overinclusive" because it conclusively presumed that all legitimates and some illegitimates were dependent on the disabled wage earner when many such persons were not in fact dependent. Since legitimate as well as illegitimate children are sometimes abandoned by their father before his death, precisely the same objection applies to this statutory classification. Moreover, the *Jimenez* classification was "underinclusive" because it conclusively excluded some illegitimates who were in fact dependent on the wage earner.[1] In this case the two appellee children

---

[1] "Even if children might rationally be classified on the basis of whether they are dependent upon their disabled parent, the Act's definition of these two subclasses of illegitimates is 'overinclusive' in that it benefits some children who are legitimated, or entitled to inherit, or illegitimate solely because of a defect in the marriage of their parents, but who are not dependent on their disabled parent. Conversely, the Act is 'underinclusive' in that it conclusively excludes some illegitimates in appellants' subclass who are, in fact, dependent upon their disabled parent. Thus, for all that is shown in this record, the two subclasses of illegitimates stand on equal footing, and the potential for spurious claims is the same as to both; hence to conclusively deny one subclass benefits presumptively available to the other denies the former the equal protection of the

were conclusively excluded from the class of eligibles even though they had been supported by their father for 15 years and eight years respectively. If the underinclusiveness of the *Jimenez* classification was arbitrary, this classification is even more objectionable because it attaches greater weight to support at a particular moment in time than to support of several years' duration.

In *Jimenez* the Secretary told the Court that the classification was "designed only to prevent spurious claims." *Id.,* at 633. The Court held that objective insufficient to justify "the blanket and conclusive exclusion" of a subclass of illegitimates. *Id.,* at 636. The statute has not changed but now we are told that the justification for a similar blanket and conclusive exclusion is "administrative convenience." I suggest that this is merely a different name for the same federal interest. For the statutory classification will not affect the processing of claims in any way except by substituting a mechanical test of dependency for the kind of inquiry that would otherwise be required to differentiate between the spurious and the genuine.

I am unable to identify a relevant difference between *Jimenez* and this case.

## II

The Court recognizes "that the legal status of illegitimacy, however defined, is, like race or national origin, a characteristic determined by causes not within the control of the illegitimate individual, and it bears no relation to the individual's ability to participate in and contribute to society." *Ante,* at 505. For that reason, as the Court also recognizes, " 'imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some rela-

---

laws guaranteed by the due process provision of the Fifth Amendment." 417 U. S., at 637.

tionship to individual responsibility or wrongdoing.' " *Ibid.* Thus the Court starts its analysis from the premise that the statutory classification is both " 'illogical and unjust.' " *Ibid.* It seems rather plain to me that this premise demands a conclusion that the classification is invalid unless it is justified by a weightier governmental interest than merely "administrative convenience."

The Court has characterized the purpose of the statute as providing benefits not for those individuals who had a legitimate claim to support from the deceased wage earner but rather for those who were actually dependent on the wage earner at the time of his death. In this analysis, the provisions of the statute which allow certain classes—such as legitimate children—to receive benefits without showing actual dependency are no more than statutory presumptions in aid of administrative convenience. This is an appropriate reading of the statute.[2]

The Court goes on, however, to hold that such presumptions in aid of "administrative convenience" are permissible so long as the lack of precise equivalence between the fact giving rise to the presumption and the fact presumed "does not exceed the bounds of substantiality tolerated by the applicable level of scrutiny," *ante,* at 509. The opinion tells us very little, however, about the "applicable level of scrutiny." It is not "our most exacting scrutiny," *ante,* at 506; on the other hand, if the classification derives "possibly rational" support from another source, it is not "inherently untenable" simply because it rests in part on illegitimacy. *Ante,* at 505. I believe an admittedly illogical and unjust re-

---

[2] There are other survivors who receive benefits only if they show dependency, *e. g.,* parents, 42 U. S. C. § 402 (h), and widowers, 42 U. S. C. § 402 (f).

sult should not be accepted without both a better explanation and also something more than a "possibly rational" basis.

The Court has repeatedly held that distinctions which disfavor illegitimates simply because they are illegitimate are invalid. *Gomez* v. *Perez,* 409 U. S. 535; *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164. However irrational it may be to burden innocent children because their parents did not marry, illegitimates are nonetheless a traditionally disfavored class in our society. Because of that tradition of disfavor the Court should be especially vigilant in examining any classification which involves illegitimacy. For a traditional classification is more likely to be used without pausing to consider its justification than is a newly created classification. Habit, rather than analysis, makes it seem acceptable and natural to distinguish between male and female, alien and citizen, legitimate and illegitimate; for too much of our history there was the same inertia in distinguishing between black and white. But that sort of stereotyped reaction may have no rational relationship— other than pure prejudicial discrimination[3]—to the

---

[3] Such pure discrimination is most certainly not a "legitimate purpose" for our Federal Government, which should be especially sensitive to discrimination on grounds of birth. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi* v. *United States,* 320 U. S. 81, 100. From its inception, the Federal Government has been directed to treat all its citizens as having been "created equal" in the eyes of the law. The Declaration of Independence states:

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness."

And the rationale behind the prohibition against the grant of any title of nobility by the United States, see U. S. Const., Art. I, § 9,

stated purpose for which the classification is being made.

In this case, the "true" classification, according to the Court, is one between children dependent on their fathers and children who are not so dependent. All of the subsidiary classifications (which have the actual effect of allowing certain children to be eligible for benefits regardless of actual dependency) are supposedly justified by the increased convenience for the agency in not being required in every case to determine dependency. But do these classifications actually bear any substantial relationship to the fact of dependency?

In this statute, one or another of the criteria giving rise to a "presumption of dependency" exists to make almost all children of deceased wage earners eligible. If a child is legitimate, he qualifies. If the child is illegitimate only because of a nonobvious defect in his parents' marriage, he qualifies. If a court has declared his father to be in fact his father, or has issued an order of support against his father, or if the father has acknowledged the child in writing, he qualifies. Apart from any of these qualifications, if the child is lucky enough to live in a State which allows him to inherit from his intestate father on a par with other children, he also qualifies. And in none of these situations need he allege, much less prove, actual dependency. Indeed, if the contrary fact is undisputed, he is nevertheless qualified.

The Court today attempts, at some length, to explain that each of these factors is rationally and substantially related to the actual fact of dependency, adopting even the somewhat tenuous rationalization of the District Court that " '[m]en do not customarily affirm in writing their responsibility for an illegitimate child unless the

---

cl. 8, equally would prohibit the United States from attaching any badge of ignobility to a citizen at birth.

child is theirs and a man who has acknowledged a child is more likely to provide it support than one who does not,' " *ante,* at 514, without also noting that a man who lives with a woman for 18 years, during which two children are born, who has always orally acknowledged that the children are his, and who has lived with the children and supported them, may never perceive a need to make a formal written acknowledgment of paternity. Even more tenuous is the asserted relationship between the status of the illegitimate under state intestacy law and actual dependency. The Court asserts that "in its embodiment of the popular view within the jurisdiction of how a parent would have his property devolve among his children in the event of death, without specific directions, such legislation also reflects to some degree the popular conception within the jurisdiction of the felt parental obligation to such an 'illegitimate' child in other circumstances, and thus something of the likelihood of actual parental support during, as well as after, life." *Ante,* at 514–515. That nebulous inference upon inference is treated as more acceptable evidence of actual dependency than proof of actual support for many years.[4]

Whether the classification is expressed in terms of eligible classes or in terms of presumptions of dependency, the fact remains that legitimacy, written acknowledgments, or state law make eligible many children who are no more likely to be "dependent" than are the children in appellees' situation. Yet in the name of "administrative convenience" the Court allows these survivors' benefits to be allocated on grounds which have

---

[4] If the relationship between an entitling presumption and the actual fact of dependency is so nebulous that the conclusion can be supported only by resort to a supposed popular conception within a jurisdiction, the classification must either be irrational, or serve a purpose other than the one by which it is assertedly justified.

only the most tenuous connection to the supposedly controlling factor—the child's dependency on his father.

I am persuaded that the classification which is sustained today in the name of "administrative convenience" is more probably the product of a tradition of thinking of illegitimates as less deserving persons than legitimates. The sovereign should firmly reject that tradition. The fact that illegitimacy is not as apparent to the observer as sex or race does not make this governmental classification any less odious. It cannot be denied that it is a source of social opprobrium, even if wholly unmerited, or that it is a circumstance for which the individual has no responsibility whatsoever.

A fair evaluation of the competing interests at stake in this litigation requires affirmance of the judgment of the District Court.

I respectfully dissent.