**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2027
_____

KAREN K. CAPATO, o/b/o B.N.C., K.N.C.,
Appellant

v.

COMMISSIONER OF SOCIAL SECURITY
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil No. 08-cv-05405)
District Judge:  Honorable Dennis M. Cavanaugh
_____

Argued:  November 15, 2010
_____

Before: BARRY, CHAGARES and VANASKIE, <u>Circuit
Judges</u>

(Opinion Filed:  January 4, 2011)
_____

Bernard A. Kuttner, Esq.  (Argued)
Kuttner Law Offices
24 Lackawanna Plaza
Millburn, NJ 07041

<u>Counsel for Appellant</u>

Kelsi B. Corkran, Esq. (Argued)
William Kanter, Esq.
United States Department of Justice

Appellate Section 7216
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
        -and
Christopher J. Brackett, Esq.
Sixtina Fernandez, Esq.
Ellen E. Sovern, Esq.
Social Security Administration
Office of General Counsel - Region II
26 Federal Plaza
New York, NY 10278
        -and-
Eric P. Kressman, Esq.
Social Security Administration
SSA/OGC/Region III
6th Floor
P.O. Box 41777
Philadelphia, PA 19101

Counsel for Appellee

_____

OPINION OF THE COURT
_____

BARRY, Circuit Judge

This case – a case that involves the rights of the posthumously conceived children of a deceased wage earner and his widow – requires us to consider the intersection of new reproductive technologies and what is required to qualify for child survivor benefits under the Social Security Act (the "Act"). It goes without saying that these technologies were not within the imagination, much less the contemplation, of Congress when the relevant sections of the Act came to be, and that they present a host of difficult legal and even moral questions. We need not reach those difficult questions given the discrete factual circumstances of this case. We, nonetheless, cannot help but observe that this is, indeed, a new world.

2

# I. Background

## A. Factual History

Robert Capato was born in the State of Washington in 1957 and, aside from a ten-year period when he resided in California, lived in Washington until the 1990s. Mr. Capato met his future wife, Karen, in Washington and subsequently moved with her to Colorado, where they lived for two years. In early 1999, the couple moved to Florida for Mr. Capato's business, and lived in Florida for approximately three years. At some point while in Florida, they decided to move to New Jersey and took some steps in that regard, but did not leave Florida prior to Mr. Capato's death.

In August 1999, shortly after the Capatos' wedding in New Jersey, Mr. Capato was diagnosed with esophageal cancer, and was told that the chemotherapy he required might render him sterile. The Capatos, however, wanted children, and thus, before he began his course of chemotherapy, Mr. Capato deposited his semen in a sperm bank, where it was frozen and stored. Somewhat surprisingly, given the treatment that Mr. Capato was by then undergoing, Ms. Capato conceived naturally and gave birth to a son in August 2001. The Capatos, however, wanted their son to have a sibling.

Mr. Capato's health deteriorated in 2001, and he died in Florida in March of 2002. His death certificate listed his residence as Pompano Beach, Florida. Three months before his death, he executed a will in Florida naming as his beneficiaries the son born of his marriage to Ms. Capato and two children from a prior marriage. Although Ms. Capato claims that she and her husband spoke to their attorney about including "unborn children" in the will, "so that it would be understood that . . . they'd have the rights and be supported in the same way that [their natural born son] was already privileged to," App. at 288, the will did not contain any such provision.

3

Shortly after Mr. Capato's death, Ms. Capato began in vitro fertilization using the frozen sperm of her husband. She conceived in January 2003 and gave birth to twins on September 23, 2003, eighteen months after Mr. Capato's death.

## B. **Procedural History**

In October 2003, Ms. Capato applied for surviving child's insurance benefits on behalf of the twins based on her husband's earnings record. The Social Security Administration denied her claim, and Ms. Capato timely requested a hearing before an administrative law judge ("ALJ"). A hearing was held on May 30, 2007, with testimony taken from Ms. Capato and two friends. On November 28, 2007, the ALJ rendered his decision denying Ms. Capato's claim. Observing that "[t]his is a case where medical-scientific technology has advanced faster than the regulatory process," *id.* at 6, and that this is a "very sympathetic case" in which "allowing benefits would appear to be consistent with the purposes of the Social Security Act," the ALJ nonetheless believed himself "constrained by applicable laws and regulations to find disentitlement." *Id.* at 7. Finding that the twins, conceived after the death of their father, "are not for Social Security purposes the 'child(ren)' of the deceased wage earner, Robert Capato, under Florida state law as required by section 216(h)(2)(A) of the Social Security Act," the ALJ concluded that they were not entitled to child's insurance benefits in accordance with sections 202(d)(1) and 216(e) of the Act and the relevant regulations. *Id.* at 8. The District Court affirmed, echoing the ALJ's interpretation of the Act and his conclusion that Mr. Capato was domiciled in Florida on the date of his death and, thus, that Florida's law of intestacy should be applied. This timely appeal, over which we have jurisdiction pursuant to 28 U.S.C. § 1291, followed. We will affirm in part and vacate in part, and remand for further proceedings.[1]

---

[1] We will affirm the dismissal of Ms. Capato's Equal Protection claim. As the Ninth Circuit found in a similar challenge, "the [Social Security Administration] is not

4

## II. Discussion

### A. Standard of Review

We review *de novo* the District Court's decision to uphold the denial of benefits. *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003). We review the ALJ's decision to assure that it was supported "by substantial evidence in the record." *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994) (internal quotation marks and citation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (internal quotation marks and citation omitted). "Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001).

### B. Entitlement to Child's Insurance Benefits

Title II of the Social Security Act, codified at 42 U.S.C. § 401 *et seq.*, allows certain categories of children to receive a survivor's benefit following the death of a "fully or currently insured individual." 42 U.S.C. § 402(d)(1). The purpose of "federal child insurance benefits" is not to provide general welfare benefits, but to "replace the support that the

---

excluding all posthumously-conceived children, only those that do not meet the statutory requirements under State law." *Vernoff v. Astrue*, 568 F.3d 1102, 1112 (9th Cir. 2009). Such a classification does not violate Equal Protection laws because it is reasonably related to the government's interest in assuring that survivor benefits reach children who depended on the support of a wage-earner and lost that support due to the wage-earner's death. *See id.* ("[T]he challenged classifications are reasonably related to the government's twin interest in limiting benefits to those children who have lost a parent's support, and in using reasonable presumptions to minimize the administrative burden of proving dependency on a case-by-case basis.").

child would have received from his father had the father not died." *Jones ex rel. Jones v. Chater*, 101 F.3d 509, 514 (7th Cir. 1996) (citing *Mathews v. Lucas*, 427 U.S. 495, 507-08 (1976)); *see also Adams v. Weinberger*, 521 F.2d 656, 659 (2d Cir. 1975) (the purpose of the Act is to provide support to children who have lost "actual" or "anticipated" support). In general, "the [Act] is to be accorded a liberal application in consonance with its remedial and humanitarian aims." *Eisenhauer v. Mathews*, 535 F.2d 681, 686 (2d Cir. 1976).

To qualify for child's insurance benefits, the applicant must be the "child," as defined in § 416(e) of the Act, of an individual entitled to benefits or who is fully or currently insured. 42 U.S.C. § 402(d)(1). Section 416(e) defines "child" broadly as, in relevant part, "the child or legally adopted child of an individual." *Id.* § 416(e)(1). Additionally, and as relevant here, the "child" (a) must have filed an application for benefits, (b) must be unmarried and less than eighteen years old (or an elementary or secondary school student under nineteen), and (c) must have been dependent upon the deceased individual at the time of his or her death. *Id.* §§ 402(d)(1)(A)-(C). "Every child (as defined in section 416(e) of this title)" will qualify, assuming, of course, that the other requisites have been met. *Id.* § 402(d)(1).

Section 416(h), entitled "Determination of family status," offers other ways by which to determine whether an applicant is a "child":

> In determining whether an applicant is the child or parent of a fully or currently insured individual for purposes of this subchapter, the Commissioner of Social Security shall apply such law as would be applied in determining the devolution of intestate personal property by the courts of the State in which such insured individual is domiciled at the time such applicant files application or, if such insured individual is dead, by the courts of the State in which he was domiciled at the time of his death.

6

*Id*. § 416(h)(2)(A).

Moreover, if an applicant is unable to inherit from the deceased wage earner under state intestacy law, the Act provides three alternative mechanisms by which to deem the applicant a "child" for purposes of survivor benefits. These alternatives are, on their face, inapplicable here and are set forth only for completeness. First, the applicant is deemed to be the "child" of the insured individual if the applicant is the son or daughter and the covered parent went through a marriage ceremony that would have been valid but for a legal impediment. *Id.* § 416(h)(2)(B). Second, the applicant is deemed to be the "child" where the insured individual, before death, either (a) acknowledged in writing that the applicant was his or her child; (b) was decreed by a court to be the mother or father of the applicant; or (c) was ordered by a court to pay child support. *Id.* § 416(h)(3)(C)(i). Third, the applicant is deemed to be the "child" where the deceased individual is shown to be the mother or father, and the deceased individual was living with or contributing to the child's support at the time of death. *Id.* § 416(h)(3)(C)(ii).

Thus, "child" is defined in different subsections of the Act -- § 416(e) and again in §§ 416(h)(2)(A), 416(h)(2)(B), and 416(h)(3). Were we to determine that the § 416(h)(2)(A) definition of "child" is appropriate here and go on to apply the law of intestacy of Florida, as the Commissioner argues we should, we would affirm. But neither the Commissioner nor the District Court, who agreed with the Commissioner, has told us why, in the factual circumstances of this case, where there is no family status to determine, we would even *refer* to § 416(h). Under § 402(d), the child is a "child" as defined in § 416(e). To accept the argument of the Commissioner, one would have to ignore the plain language of § 416(e) and find that the biological child of a married couple is not a "child" within the meaning of § 402(d) unless that child can inherit under the intestacy laws of the domicile of the decedent. There is no reason apparent to us why that should be so, and we join the Ninth Circuit in so concluding.

7

In *Gillett-Netting v. Barnhart*, 371 F.3d 593 (9th Cir. 2004), a case factually identical to the case before us,[2] the Ninth Circuit explained that §§ 416(h)(2) and (3) "were added to the Act to provide various ways in which children could be entitled to benefits even if their parents were not married or their parentage was in dispute," and have "no relevance" for determining whether a claimant is the "child" of a deceased wage earner where parentage is not in dispute. 371 F.3d at 596. The Commissioner conceded that Mr. Netting's children were his biological children, *id.* at 597, as here the Commissioner concedes that Mr. Capato's children are his. The Ninth Circuit found that the district court erred when it concluded that Mr. Netting's children were not "children" for purposes of the Act.[3]

In response to *Gillett-Netting*, the Commissioner issued an "Acquiescence Ruling," effective September 22, 2005.[4] *See* Social Security Acquiescence Ruling 05-1(9), 70 Fed. Reg. 55,656 (Sept. 22, 2005). The Acquiescence Ruling

---

[2] The husband was diagnosed with cancer, was advised that chemotherapy might render him sterile, and his semen was frozen and stored in hopes that, even after he died, his wife would have his children. His wife conceived by means of in vitro fertilization and gave birth to twins eighteen months after his death.

[3] Because, in the case before us, the District Court did not reach the issue of dependency given its conclusion that the definition of "child" was not satisfied, we, therefore, need not address the Ninth Circuit's conclusion that Mr. Netting's children were "conclusively deemed dependent on [him] under the Act" and why that was thought to be so. 371 F.3d at 599.

[4] "An acquiescence ruling explains how we will apply a holding in a decision of a United States Court of Appeals that we determine conflicts with our interpretation of a provision of the Social Security Act (Act) or regulations when the Government has decided not to seek further review of that decision or is unsuccessful on further review." *See* Social Security Acquiescence Ruling 05-1(9), 70 Fed. Reg. 55,656 (Sept. 22, 2005).

limited the application of *Gillett-Netting* to claims within the Ninth Circuit. *Id.* at 55,657. It also contained a "Statement as to How *Gillett-Netting* Differs From SSA's Interpretation of the Social Security Act." *Id.* In that Statement, the Commissioner hewed to the arguments she had made to the Ninth Circuit: in all cases, § 416(h) "provides the analytical framework that we must follow for determining whether a child is the insured's child for the purposes of section [416(e)]," and § 416(h)(2)(A) directs the application of state intestacy law or the alternative mechanisms in §§ 416(h)(2)(B) and 416(h)(3)(C) to determine whether a child is a "child." *Id.* An "after-conceived" child, she continued, cannot satisfy the alternative mechanisms in §§ 416(h)(2)( B) and 416(h)(3)(C), and "[c]onsequently, to meet the definition of 'child' under the Act, an after-conceived child must be able to inherit under State law." *Id.* There was no explanation as to why the statute even suggests, much less compels, that result.

The Commissioner has attempted to explain to us why the Ninth Circuit's analysis of the Act's legislative history was "indisputably mistaken." The explanation goes as follows: "When child survivor benefits were established in 1939, section 416(h)(2)(A) was the only way any child could be eligible for benefits." Appellee's Br. at 34. Because no effective means existed at that time to scientifically prove a child-parent relationship, Congress determined that the primary way to prove child status should be eligibility to inherit under state law. *Id.* Given that state laws would have provided for inheritance by the child of a marriage, that child would have no problem qualifying as the wage-earner's "child" for survivor benefits under the Act. The Commissioner argues that even though Congress added § 416(h)(3) in 1965 to provide additional ways by which a child could prove "child" status, "that addition did nothing to change the existing requirement that all children, even including children of married parents whose parentage was not in dispute, satisfy at least one of the provisions of section 416(h)." *Id.* at 35.

The explanation ignores the fundamental question: why should we, much less why *must* we, refer to § 416(h) when § 416(e) is so clear, and where we have before us the undisputed biological children of a deceased wage earner and his widow. The plain language of §§ 402(d) and 416(e) provides a threshold basis for defining benefit eligibility. The provisions of § 416(h) then provide for "[d]etermination of family status"—subsection (h)'s heading—to determine eligibility where a claimant's status as a deceased wage-earner's child is in doubt. Were it the case that such status had to be determined here, we would turn to the relevant provisions of § 416(h). But a basic tenet of statutory construction is that "[i]n the absence of an indication to the contrary, words in a statute are assumed to bear their 'ordinary, contemporary, common meaning.'" *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993)). The term "child" in § 416(e) requires no further definition when all parties agree that the applicants here are the biological offspring of the Capatos. Stated somewhat differently, we do not read §§ 402(d) or 416(e) as requiring reference to § 416(h) to establish child status under the facts of this case. Our analysis does not render § 416(h) superfluous but, rather, places it in context with § 416(e) and the clear command of § 402(d)(1) to refer to § 416(e) to define the word "child."[5]

We acknowledge that another factual scenario might render the Commissioner's concerns more persuasive. Those concerns must, however, await another case, though we note them ourselves with some concern:

> [A]lthough biological paternity can now be scientifically proven to a near certain degree of

[5] Because we can resolve this issue based on our analysis of Congress' "unambiguously expressed intent" in the statutory language, we need not determine whether the Commissioner's interpretation is a permissible construction of the statute. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

probability, modern artificial reproduction technologies currently allow for variations in the creation of child-parent relationships which are not solely dependent upon biology. The use of donor eggs, artificial insemination, and surrogate wombs could result in at least five potential parents. Accordingly, even in modern times, the basic assumption underlying the *Gillett-Netting* panel's reasoning – *i.e.*, that biological paternity always results in an 'undisputed' child-parent relationship – is unfounded.

Appellee's Br. at 36 (internal citation omitted).

To be sure, as the Ninth Circuit put it, "[d]eveloping reproductive technology has outpaced federal and state laws, which currently do not address directly the legal issues created by posthumous conception." *Gillett-Netting*, 371 F.3d at 595. As we have noted, the more difficult of those legal issues are not before us. What *is* before us is a discrete set of circumstances and the narrow question posed by those circumstances: are the undisputed biological children of a deceased wage earner and his widow "children" within the meaning of the Act? The answer is a resounding "Yes." Accordingly, we will vacate the order of the District Court in part and remand for a determination of whether, as of the date of Mr. Capato's death, his children were dependent or deemed dependent on him, the final requisite of the Act remaining to be satisfied.[6]

---

[6] Given this disposition, it is not necessary for us to determine where Mr. Capato was domiciled at his death or to delve into the law of intestacy of that state. We note, however, that were we to decide the issue of domicile, we would likely conclude that it was Florida.