Victoria Ann **CAPE**

v.

**TENNESSEE SECONDARY SCHOOL ATHLETIC ASSOCIATION et al.**

**Civ. No. 3–76–234.**

United States District Court, E. D. Tennessee, N. D.

Nov. 24, 1976.

Ann Mostoller, Dorothy B. Stulberg, Oak Ridge, Tenn., for plaintiff.

Phil Condra (School Board), Oak Ridge, Tenn., Charles Hampton White (TSSAA), Nashville, Tenn., for defendants.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

Plaintiff, a junior female student at Oak Ridge High School (ORHS), claims that the State of Tennessee has denied her the right to equal protection of the laws as guaranteed by the Fourteenth Amendment of the United States Constitution. She seeks relief under 42 U.S.C. § 1983 and its jurisdictional counterpart 28 U.S.C. § 1343(3). Plaintiff also alleges that she is entitled to relief under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.

The basis of plaintiff's claim is that the rules for girls' basketball, promulgated and enforced by the defendants, are different from those applied to boys' basketball and that the application of different rules to girls' basketball is a deprivation of her right to equal protection of the law, i. e., it is an arbitrary, capricious, and unreasonable distinction.

Defendant, Tennessee Secondary School Athletic Association (TSSAA) is a voluntary association of approximately 526 junior and senior high schools, both public and private, in the State of Tennessee. TSSAA promulgates rules for participation in interscholastic junior and senior high school athletics. The rules are enforced by public school personnel. The other defendants are officials of the Oak Ridge public schools.

Plaintiff asserts that she is denied the full benefits of playing basketball because as a guard she is never able to set up plays and participate in the strategy of the game. She states she is denied the physical development that results from playing the full-court game. She also claims it will be virtually impossible for her to obtain an athletic scholarship in basketball since she will have played only as a guard and will lack training in the shooting skills of a forward. She has contacted athletic departments of several of the better schools in girls' college basketball, which have indicated that a player in her position would "likely not be considered as worth recruiting and would definitely not have an edge at all if an athletic scholarship based on basketball ability were concerned." [Exhibit 2, attached to Complaint]. Plaintiff further asserts that there are no physical attributes of women which prevent them from utilizing the entire basketball court.

It is defendants' position that the complaint fails to state a claim upon which relief can be granted because plaintiff has no federally protected right to play basketball, and the rules for girls' basketball adopted and enforced by the defendants do not deny her equal protection of the law.

The first hearing on this matter was held on August 24, 1976, which was followed by a second hearing on October 25, 1976. Much testimony was heard and briefs have been filed by all parties.

## I. TSSAA Girls' Basketball Rules

The National Federation of State High School Associations (NFSHSA), of which TSSAA is a member, has published its 1976–77 Official Basketball Rules for girls and boys. This rule book [Exhibit 1, First Hearing], as originally published, makes no major distinction between girls' and boys' teams, i. e., both the girls and boys play the traditional full-court, five-player, "run and shoot" basketball game. Tennessee, along with four or five [1] other states, has added a different set of rules for girls. All college and international women's basketball is played under the full-court rules.

On the back of this NFSHSA Rule Book, the TSSAA has added a set of nine supplemental rules that are applied only to girls' basketball. The following is a brief summary of these supplemental rules contrasted to the rules in the NFSHSA Rule Book:

---

**1.** Plaintiff states that five states apply the split-court rules to girls. Defendant lists six states that apply split-court rules to girls: Tennessee, Iowa, Texas, New York, Arkansas and Oklahoma.

| TSSAA Girls' Rules | NFSHSA Girls' & Boys' Rules |
|---|---|
| 1. Each team has six players (three forwards and three guards) one of whom is the captain. | Each team has five players, one of whom is the captain. |
| 2. After the scorers are notified, any player in the game may change from one court to the other during an intermission, between periods, during a charged time-out and following a substitution. (This must mean changing from one half-court to the other half-court). | Since all players play on the full-court, there is no comparable rule. |
| 3. Only forwards may play in their team's front court (the half-court that includes that team's basket). Only guards may play in their team's back court (the half-court that includes the opposing team's basket). | All ten players on the court may play on the entire court, front and back. There are restrictions on "back courting" a ball by the team in control. |
| 4. Forwards may throw the ball into play (e.g. after the opposing team scores) from the center restraining circle. | The center restraining circle is never used as an area from which to throw the ball into play. |
| 5. Only forwards may score a goal for their team. | Any team member may score a goal for his or her team. |
| 6. Playing time shall be four seven-minute quarters. | Playing time shall be four eight-minute quarters. |
| 7. If the score is tied at the end of a regular game, play continues without change of baskets for one or more extra periods. Each extra period shall be two minutes in time. | Same--except each extra period is three minutes in time. |
| 8. All held balls are jumped at the nearest free throw circle, except when a held ball is called between two opponents from different ends of the court (e.g. between forwards from opposing teams.) | All held balls are jumped at the nearest free throw circle. |
| 9. Only forwards may shoot free throw(s) awarded because of a personal foul. (When a guard is fouled, a forward must shoot the free throw). | The offended player shoots his or her own free throw(s) awarded because of a personal foul, except when injury or disqualification forces the player to withdraw. |

---

## II. *Summary of the Testimony*

The plaintiff testified that she was a starting guard on last year's girls' basketball team at ORHS and has played basketball since the seventh grade. This past summer at a basketball camp, she played center (plaintiff's height is 5′ 10″) on a five-girl team playing under full-court

rules. She stated that she wanted to play forward on the ORHS team and had informed the coach of her desire, but the coach preferred her to play guard.

The plaintiff stated that she is currently practicing with the ORHS girls' team as a guard, and she fully expects to play when the season starts in a few weeks. She feels that due to the girls' rules she is unable to develop her shooting and other offensive skills, and will therefore be hampered in her attempts to obtain a college basketball scholarship. She feels that under the full-court rules, she would get a chance to develop her shooting ability.

Ms. Jackie Butler, a physical education teacher and the girls' basketball coach at Harriman High School, testified that, based on her studies and training, she knew of no physiological reason for applying different rules to girls in basketball competition. In her opinion the full-court game is more healthful. As far as college scholarships, she said that recruiters were primarily interested in girls who had played forward because the guards were not taught essential offensive skills, particularly shooting.

Stuart Aberdeen, Associate Coach of the University of Tennessee men's basketball team, has directed a boys' and girls' basketball camp for the last four years. He said he offered the same program for all the participants and did not differentiate between girls and boys. In his opinion, the split-court rules deprive all the girls of some important skills. For example, a girl never learns to handle the ball in "heavy traffic." She plays on one end of the court with five other players, while a boy learns to handle the ball at full-court speed among nine other players. He added that an entirely new mental concept of the game, as well as additional skills, must be learned by any girl (forward or guard) who changes to the full-court rules in college after playing under split-court rules.

Ms. Pat Head, captain of the U.S.A. women's basketball team at the Olympics in Montreal (winner of the silver medal), head coach of the University of Tennessee women's basketball team and physical education instructor at the University, testified that the college scholarship opportunities for women athletes had increased drastically in recent years and she expected even better opportunities for them in the future. She added that in college and the Olympic Games women play full-court, five-player basketball. In coaching girls who had played under the split-court rules, she felt there was both a mental and physical handicap for them to overcome when changing to the full-court college game. She noted that of the eleven Tennesseans on her team, ten were offensive players in high school. Offensive players have a definite advantage in securing scholarships, in her opinion.

Gil Gideon, Executive Secretary of the TSSAA, stated that, in his opinion, the girls' rules were adopted because those rules: (1) were more interesting to the fans; (2) were necessary to prevent girls from straining themselves; (3) allowed more participation; and, (4) aided the clumsy girls who couldn't play full-court. He added that there are other sports for which TSSAA enforces a different set of rules for girl participants than those enforced in the boys' competition.

Gaylon Johnson, coach of the Porter High School girls' basketball team, stated that some girls were not capable of playing full-court ball, and he thought the split-court game was a better game for the girls.

Ms. Doris Rogers, coach of the McGavock High School girls' basketball team in Donelson, stated that she usually prefers to use her best athletes as forwards and added that colleges are ordinarily more interested in forwards. She stated she preferred the split-court game, and that she taught her forwards and guards essentially the same skills, except shooting. She felt the full-court game was more strenuous but not too strenuous for girls.

James Smiddy, coach of the girls' basketball team at Bradley County High School, feels that the only difference in the skills he teaches his forwards and guards is that only forwards are taught to shoot. The split-court game is the "prettiest thing about girls' basketball," in his opinion, and the

girls' game would be less interesting and less exciting if played full-court. He has had guards who were more sought after by colleges than his forwards because he likes to place good athletes on each end of the court.

Coach Brandon, coach of the Lebanon High School girls' basketball team, feels the split-court game is faster and more interesting.

### III. *Title IX Jurisdiction*

Title IX of the Education Amendments of 1972 (hereinafter "Title IX"), 20 U.S.C. § 1681 *et seq.*, prohibits discrimination based on sex in most educational institutions receiving federal assistance. Title IX, in pertinent part, states:

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance, . . . ."

Plaintiff contends that Title IX provides an independent basis of federal jurisdiction for her action. Defendants maintain that she has not pursued her administrative remedies within the Department of Health, Education and Welfare.

■ The Court is of the opinion that, for two reasons, plaintiff is not entitled to relief under Title IX. First, the Court is in agreement with the holding of the Seventh Circuit Court of Appeals in *Cannon v. University of Chicago*, Nos. 76–1238 and 76–1239, slip opinion at 10–16 (7th Cir. Aug. 27, 1976), that, for most situations, Title IX is not to be interpreted as a grant of a private right of action. Secondly, even if a private right of action could be said to exist under Title IX, it would appear that a plaintiff would be required to exhaust the administrative remedies made available under the Act before bringing an action in federal court.

■ Jurisdiction does exist, however, under 28 U.S.C. § 1343(3) because the requisite state action is present. *See Carnes v. TSSAA*, 415 F.Supp. 569 (E.D.Tenn.1976).

### IV. *Standing*

■ The essence of the standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant *her* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on her behalf. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). "A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action . . . .' " *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), quoting from *Linda R. S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

■ The proof established that plaintiff played as a guard on last year's ORHS girls' team, that she has been practicing this fall with the team as a guard, and that, barring unforeseen circumstances, she will play for the team as a guard when regular season play begins in November. As a member of a girls' basketball team that is subject to the TSSAA split-court rules plaintiff has standing to challenge the split-court rules. Also, as a guard playing under these rules, she has standing to challenge the prohibition on shooting that is applied to guards. The Court is of the opinion that plaintiff has alleged a "distinct and palpable injury" to herself, *Warth, supra*, at 501, that represents a "personal stake in the outcome."

Defendants have alleged that plaintiff chose to play guard rather than forward and therefore she waived her right to challenge the prohibition on shooting applied to guards. While the Court finds that the proof does not support defendants' claim that plaintiff chose to play guard, inquiry as to whether she chose to play such a position or had no say in the matter is inapposite. She is injured by the rules applied to guards because she *is* a guard. Having established that fact, she has standing to challenge the prohibition on shooting applied to guards.

## V. The Merits: Equal Protection

█ Much of defendants' argument has focused upon whether plaintiff has a "property interest" in shooting a basketball sufficient to invoke the due process guarantee of the Fourteenth Amendment. An analysis of this nature may have been appropriate if due process of law were at issue rather than equal protection of the laws. Plaintiff does not contend that she has a right to shoot or even to play basketball based upon a "property interest." The basis of her claim is that, solely because of her sex, she has been deprived of benefits that are conferred upon persons similarly situated. Whether those benefits are characterized as rights or privileges is of no moment. For this reason, cases such as *TSSAA v. Williams*, No. 76–1067 (6th Cir. Apr. 8, 1976), which have declared that a student has no federally protected right to participate in interscholastic athletics, are inapposite.

### A. Strict Scrutiny

█ The Equal Protection Clause does not require identical treatment for all citizens of a State. A State may classify its citizens for various purposes and treat those classes differently. The Supreme Court in *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) noted:

> "In applying that clause, this Court has consistently recognized that the Fourteenth Amendment does not deny to States the power to treat different

classes of persons in different ways. (citations omitted)" 404 U.S. at 75, 92 S.Ct. at 253.

The Supreme Court has developed a two-tiered standard of review in applying the Equal Protection Clause. A "strict judicial scrutiny" standard has been applied when the class upon which the state bases its classification is a group designated by the Court as an "inherently suspect class," such as race,[2] alienage,[3] and national ancestry[4] or when a "fundamental interest" is infringed by the classification, such as marital privacy,[5] or voting.[6] Plaintiff admits her interest in playing full-court basketball fails to rise to the status of a fundamental interest,[7] but she has urged the Court to strictly scrutinize the classification because sex is an inherently suspect class.

The Supreme Court has, since its first decision invalidating a sex-based classification in 1971,[8] consistently avoided the question of whether sex should be considered a suspect class and subjected to strict scrutiny. Although a plurality of the Court designated sex as a suspect class in *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), a majority of the Court continues to find it "unnecessary to decide" this question. *See Stanton v. Stanton*, 421 U.S. 7, at 13, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975). But the Court has recently indicated that it may be willing to reach the question, and perhaps declare sex a suspect class.[9]

---

2. *See, e. g., Loving v. Virginia*, 388 U.S. 1, 10, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

3. *See, e. g., Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

4. *See, e. g., Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 1435 (1944).

5. *See Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

6. *See, e. g., Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

7. Education itself is not a fundamental interest. *San Antonio Independent School District v. Ro-*

*driguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). For a thorough analysis of equal protection review, including "strict scrutiny", prior to 1970, *see Developments in the Law-Equal Protection*, 82 Harv.L.Rev. 1065 (1969).

8. *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

9. The dictum of *Mathews v. Lucas*, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976), raises the question of how the Supreme Court would rule on the issue of whether sex is an "inherently suspect" classification if faced with the issue today. Mr. Justice Blackmun, for a six-member majority, in *Mathews*, stated:

> " . . . and perhaps in part because illegitimacy does not carry an obvious badge, *as race or sex do*, this discrimination against illegitimates has never approached the sever-

The Sixth Circuit Court of Appeals has expressly held that sex is not a suspect class, and that sex-based classifications should be subjected to the less demanding "rational relationship" standard of review. *Smith v. Troyan*, 520 F.2d 492, 495 (6th Cir. 1975), *cert. den.* 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976). However, in the recent case of *Kalina v. Railroad Retirement Board*, 541 F.2d 1204 (6th Cir. 1976), the Court indicated that it might reconsider that holding. Another circuit court has held that sex-based classifications must be reviewed under an "intermediate" test that is less demanding than strict scrutiny but more demanding than the traditional rational relationship test. *Eslinger v. Thomas*, 476 F.2d 225 (4th Cir. 1973). *Cf. Green v. Waterford Board of Education*, 473 F.2d 629, 633–34 (2d Cir. 1973). *See also* Johnston, *Sex Discrimination and the Supreme Court–1975*, 23 U.C.L.A.L.Rev. 235 (1975). Under the circumstances of this case, however, it is not necessary to determine which standard of review should be applied to the classification in question, for the Court is of the opinion that the girls' split-court rules fail to satisfy even the traditional rational relationship test.

B. *Rational Relationship Standard*

Historically, the "rational relationship" standard of reviewing state classifications has been a permissive criterion. The common expression of this standard is that a classification "must be sustained if it 'bears a rational relationship to a [legitimate] state objective.'" *Smith v. Troyan, supra.*

■ In applying the rational relationship standard, the Court must first determine what were the state's objectives or purposes in establishing the split-court rules for interscholastic basketball. Then, the Court must determine if these objectives are legitimate, *i. e.*, do not run afoul of the Constitution. *See, e. g., Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (furthering racial hostilities was held to be an illegitimate objective).

Defendants have offered much proof purporting to explain the objectives furthered by the split-court rules. The Court has distilled from the testimony the following asserted objectives.

1. To protect those student athletes who are weaker and incapable of playing the full-court game from harming themselves.
2. To provide the opportunity for more student athletes to play in basketball games.
3. To provide the opportunity for awkward and clumsy student athletes to play defense only.
4. To provide a "more interesting" and "faster" game for the fans.
5. To ensure continued crowd support and attendance (game receipts) because the fans are accustomed to a split-court game.

"[T]he mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514 (1975). The Court will assume, however, that these alleged purposes were, in fact, the actual objectives which the State sought to achieve by establishing the split-court rules. Additionally, the Court is of the opinion these objectives are legitimate, *i. e.*, not unconstitutional in and of themselves.

Having determined five legitimate state objectives, the next question is whether the classification system chosen by the State is rationally related to the furtherance of any of these objectives. Mr. Chief Justice Burger, for a unanimous Court, has articulated a test for determining whether a classification is rationally related to a state objective. The Court held:

ity or pervasiveness of the historic legal and political discrimination *against women and Negroes*. See *Frontiero v. Richardson*, (citations omitted)." (emphasis added). 427 U.S. at 506, 96 S.Ct. at 2762

On October 5, 1976, the Supreme Court heard oral arguments on two cases involving equal protection challenges to sex-based classifications. *Craig v. Borden*, No. 75–628 and *Mathews v. Goldfarb*, No. 75–699.

"A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971), quoting from *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920).

The question presented in this case, then, is whether a difference in sex of the members of junior and senior high school interscholastic basketball teams bears a rational relationship to any of the aforementioned state objectives that are sought to be advanced by the operation of the split-court rules. The five objectives will be discussed separately.

■ *Objective 1.* Protection of weaker and less capable athletes from harming themselves by playing the strenuous full-court game of basketball is a legitimate objective. However, there are several problems with the defendants' argument that the classification by sex bears a rational relationship to this objective. The use of sex as the criterion for achieving this objective is both under-inclusive and over-inclusive. Because there are surely some boys who could benefit from the split-court, less strenuous game played by the girls, the classification fails to include all the weak and incapable athletes. Similarly, there are female athletes, including the plaintiff, who are willing and able to play the full-court game. Therefore, the classification includes those not in need of protection. Indeed, the proof established that most female basketball players are capable of playing full-court ball. We hold that the classification bears no rational relationship to this objective.

■ *Objective 2.* The split-court rules do allow a team to place six players, instead of the usual five, on the court at one time. But, as one witness pointed out, a full-court game often requires much substitution and, depending on how a coach runs his or her team, the five-player, full-court game may result in more participation for a greater number of players than would the six player, split-court rules. Regardless of whether the split-court game does, in fact, allow more participation, the Court finds that classification on the basis of sex is not a rational means of accomplishing the objective of greater participation.

■ *Objective 3.* Again, as in the discussion above concerning the first objective, we find that the sex-based classification is both over and under-inclusive in relation to the objective of allowing awkward and clumsy athletes to play. Undoubtedly, there are many awkward and clumsy male athletes who could benefit from playing under the split-court rules. Also, there are many graceful and agile female athletes who gain nothing from rules intended to benefit the awkward and clumsy.

■ *Objectives 4 and 5.* The Court is of the opinion that the objectives of sustaining crowd interest and support (game receipts) are insufficient justifications to support a sex-based classification resulting in disparate educational opportunities. We note that administrative convenience, *i. e.,* saving the government certain costs, has been rejected several times as a basis for sex discrimination. *See, e. g., Reed v. Reed, supra.* It is unlikely, therefore, that a *predicted* drop in crowd support and revenue would suffice to support a sex-based classification when a *guaranteed* savings of governmental expenditures failed to do the same. *See id.*

Furthermore, the proof has raised serious doubt concerning the defendants' claims that the girls' game is more interesting, and that a change to full-court rules would diminish crowd support. For example, Coach Aberdeen stated that, in his opinion, girls' basketball is popular in Tennessee, not because of the split-court rules, but because of good coaches, good athletes, citizens in the State who support their young female athletes, and the considerable tradition of high quality, competitive, interscholastic girls' basketball in this State.

Further analysis of Objective 1 (protecting the weaker and less capable athletes) and Objective 3 (providing awkward athletes with an opportunity to play) leads to the conclusion that they are based on an underlying assumption that female student athletes are weaker, less capable, and more awkward than their male counterparts. The Supreme Court has held that such "archaic and overbroad" sex-based generalizations "could not be tolerated under the Constitution." *Weinberger v. Wiesenfeld, supra,* 420 U.S. at 643, 95 S.Ct. at 1231.

■ The Court holds there is no rational relationship between the State's legitimate objectives and the sex-based classification chosen to implement those objectives. Our inquiry does not end here, however, as defendants have contended that, even if the legal principle of equal protection has been violated, the plaintiff has failed to allege sufficient injury to require legal redress.

## VI. *Is the Plaintiff's Injury De Minimus?*

There are strong policy reasons supporting noninterference with State classifications that result in little harm or burden to the disfavored class. When the harm or injury suffered by a plaintiff is truly slight or a trifle, *i. e.,* de minimus, some courts have declined to provide a legal remedy, even though the challenged state classification constitutes a technical violation of the law.

■ There are no easily ascertainable standards for determining when a plaintiff's injury is de minimus. In *Forbush v. Wallace,* 341 F.Supp. 217 (M.D.Ala.1971) (three-judge court), *aff'd mem.* 405 U.S. 970, 92 S.Ct. 1197, 31 L.Ed.2d 246 (1972), the Court, as an alternative ground for upholding an Alabama sex-based classification, concluded that the injury suffered by the plaintiff and her class was de minimus. The Court used a balancing approach to reach this conclusion:

"In balancing the interest of the plaintiff and the members of plaintiff's class against the interest of the state, this Court concludes that the administrative inconvenience and cost of a change to the State of Alabama far outweigh the harm caused the plaintiff and the members of plaintiff's class. In balancing these interests, this Court notes that the State of Alabama has afforded a simple, inexpensive means by which any person, and this includes married women, can on application to a probate court change his or her name. (citation omitted). Thus, on balance, plaintiff's injury, if any, through the operation of the law is *de minimus.* (footnote omitted)" *Id.* at 222.

The Sixth Circuit Court of Appeals has expressly relied on the balancing of interests approach used in *Forbush* to find a de minimus injury.[10] At least one other court has used the *Forbush* balancing approach to find a de minimus injury and thereby uphold a sex-based state classification.[11] Some courts may be applying a de minimus injury standard when they hold that a sex-based classification raises no substantial constitutional question, but when the issue is dealt with in these terms the courts apparently feel no need to offer a rationale for their holding.[12]

Similarly, no rationale is offered when an injury, though slight, is found not to be de minimus. The Fourth Circuit Court of Appeals, in *Eslinger v. Thomas,* 476 F.2d 225

10. In *Whitlow v. Hodges,* 539 F.2d 582 (6th Cir. 1976), the Sixth Circuit upheld an unwritten Kentucky regulation, identical to the unwritten Alabama regulation upheld in *Forbush.* The Court found that *Forbush* was binding precedent (*Forbush* was summarily affirmed by the Supreme Court) on the de minimus injury ground.

11. *See Ogren v. Miller,* 373 F.Supp. 980 (W.D. Ky.1973). *But see Johnston v. Hodges,* 372 F.Supp. 1015 (E.D.Ky.1974).

12. *See, e. g., King v. Saddleback Jr. College Dist.,* 445 F.2d 932 (9th Cir. 1971), *cert. denied* 404 U.S. 979, 92 S.Ct. 342, 30 L.Ed.2d 294 (1971); *Olff v. East Side Union High School Dist.,* 445 F.2d 932 (9th Cir. 1971), *cert. denied* 404 U.S. 1042, 92 S.Ct. 703, 30 L.Ed.2d 736 (1972) (sex-based hair length regulations in public schools); *cf. Hill v. Estelle,* 537 F.2d 214 (5th Cir. 1976) (sex-based grooming, room decoration, and phone use regulations in prison).

(4th Cir. 1973), found that a small distinction between the duties of "senate pages" (only males) and "clerical assistants" and "committee attendants" (members of both sexes) in the South Carolina Senate was sufficient injury to the female plaintiff to require invalidation of the prohibition on females becoming senate pages. The only duties which females were precluded from performing under this classification were those of "running personal errands, driving senators about in their autos, packing their bags in hotel rooms, cashing personal checks for senators" and other personal errands. *Id.* at 231.

The First Circuit has held that a prohibition on serving beverages to women customers in certain types of bars constituted a sufficient injury to females to require invalidation of the statute on equal protection grounds.[13] One court has held that the requirement that a female voter registrant prefix her name with "Miss" or "Mrs.", when no such designation of marital status was required of male registrants, was a sufficient injury to females to require invalidation of the requirement.[14] While these courts offered no explanation of why the injury was considered to be greater than de minimus, the conclusion that the injury in question was sufficient to require legal remedy may serve to guide this Court in evaluating the severity of the plaintiff's injury.

Defendants contend that the benefits enjoyed by the plaintiff as a basketball player are substantially the same as those enjoyed by her male counterparts, and thus she has suffered only a de minimus injury. Defendants argue, for example, that plaintiff has been taught how to play the sport of basketball, has enjoyed the physical and emotional development of participating in interscholastic athletics, and has been given substantially the same chance to develop her athletic abilities as has been given to

male basketball players. They point out that almost every sport sanctioned by TSSAA has some minor distinction based on the sex of the participant,[15] and if legal redress is granted in this case, the Court may be required to intervene in all these other sports.

Plaintiff denies the contention that she receives substantially the same benefits as do her male counterparts. Plaintiff asserts that because the full-court game is more strenuous, all female basketball players are deprived of the extra physical conditioning and development they would enjoy if they played full-court ball. She also alleges that guards, like herself, are deprived of the development of an *essential* skill necessary to the game of basketball, *i. e.*, shooting the ball, as well as other offensive skills. Plaintiff further contends that her failure to develop whatever shooting and other offensive skills she might possess, as well as her inexperience in playing full-court ball, amount to serious handicaps in her efforts to obtain a college athletic scholarship. In light of these factors, plaintiff avers that her injury is significantly more than de minimus.

In evaluating plaintiff's injury, the Court recognizes that athletics "has come to be generally recognized as a fundamental ingredient of the educational process." *Kelley v. Metropolitan County Bd. of Education,* 293 F.Supp. 485 (M.D.Tenn.1968). Athletics is no longer strictly an "extra-curricular" activity, but has become an integral ingredient in a well rounded curriculum. Thus, any injury suffered by the plaintiff can be spoken of in terms of a deprivation of an equal educational opportunity solely by reason of her sex.

Furthermore, the proof shows that plaintiff is deprived of the greater health benefits enjoyed by male players under the full-court rules. And, finally, the proof es-

---

13. *Women's Liberation Union of Rhode Island v. Israel,* 512 F.2d 106 (1st Cir. 1975).

14. *Walker v. Jackson,* 391 F.Supp. 1395 (E.D. Ark.1975). The District Court used a combination of balancing the interests and the rational basis test to void the requirement.

15. *E. g.,* golf (shorter tees for females); cross-country (shorter distances for females); track (shorter distances for females).

tablishes that the plaintiff, due to the shooting prohibition applied to guards, has a lesser opportunity to gain a college scholarship than she would if she could play under the full-court rules. Thus, the Court concludes that plaintiff's injury is significant.

Applying the *Forbush* balancing test to plaintiff's injury does not lessen the significance of plaintiff's injury. No "simple and inexpensive" alternative is available to the plaintiff that would provide her with a means to develop and display her offensive basketball skills. Because of the statewide application of the TSSAA rule, the only feasible alternative would be for the plaintiff to enroll in a school in a state which allows the girls' teams to play full-court ball. As far as any administrative convenience or cost efficiency arguments available to the defendants, it would appear that functioning under one set of rules rather than two would be more efficient and convenient for officials, coaches, referees, and athletes. When all these factors are considered, including the intrinsic value of equal educational opportunities, the Court is of the opinion, and holds, that plaintiff's injury is not de minimus and thus deserves a legal remedy.

In response to the defendants' argument that, if a legal remedy is granted herein, almost every TSSAA sport will be subject to court intervention, the Court notes that the judgment rendered herein applies only to the severe restrictions placed on female basketball players. These restrictions are of such significance that the Court cannot term the injury resulting therefrom as de minimus.

As stated to counsel, the Court is extremely reluctant to interfere with the judgment of state officials and professional educators. However, when a state chooses to deny a significant educational experience to a class of its citizens solely because of sex, and no rational justification for such different treatment can be found, the Constitution requires that such distinction be voided.

For the foregoing reasons, it is ordered that the rules applicable to girls' basketball which impose half-court, six-player restrictions and which permit only forwards to shoot (*see* 1976–77 Rules Supplement for Girls' Basketball, Rules 1–5, 8 and 9), be, and the same hereby are, declared to be in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Because the plaintiff did not challenge the different time periods applied to female teams (see Rules 6 and 7), those rules are not affected by this ruling. Defendants shall be allowed a reasonable time within which to implement the Court's holding so as to allow an orderly transition.

The Court is of the opinion that TSSAA and the other defendants will abide by the within holding and for that reason an injunction is not appropriate at this time.

Order Accordingly.