Carl A. SOAVE, Plaintiff,

and

Shirley Hoag, Susan Deurloo, Dennis J. Kelley, Lois Ritchie and Kerry M. Young, Individually and on behalf of all other persons similarly situated, Intervening Plaintiffs,

v.

William MILLIKEN, Governor of the State of Michigan, Individually and in his official capacity, and John T. Dempsey, Director of the Michigan Department of Social Services, Individually and in his official capacity, Defendants.

No. G80–444 CA1.

United States District Court,
W. D. Michigan, S. D.

July 31, 1980.

Kirk S. Hazen, Hazen, Meeks & Schultze, Grand Rapids, Mich., for plaintiff Carl Soave.

Gary N. Gershon, Legal Aid of Western Mich., Grand Rapids, Mich., for intervening plaintiffs.

Frank J. Kelley, Atty. Gen., by Robert N. Rosenberg, Lansing, Mich., for defendants.

OPINION

DOUGLAS W. HILLMAN, District Judge.

Plaintiff, Carl A. Soave, a recipient of general assistance from the Michigan De-partment of Social Services, brings this suit challenging the State's termination of his general assistance shelter allowance and the denial of a hearing in effecting that termi-nation. He seeks declaratory and injunc-tive relief, as well as damages. This action is brought pursuant to 42 U.S.C. § 1983, claiming violations of the due process and equal protection clauses of the Fourteenth Amendment. Jurisdiction is based on 28 U.S.C. § 1343(3) and (4), with declaratory relief requested pursuant to 28 U.S.C. § 2201 and 2202. In addition, there is a pendent claim under the Michigan Adminis-trative Procedures Act of 1969. (M.C.L.A. § 24.201, *et seq.*) The case is presently before the court on plaintiff's motion for preliminary injunctive relief. For the rea-sons that follow, I grant plaintiff's motion for preliminary injunction.

FACTS

Plaintiff is a person disabled by epilepsy and is a recipient of general assistance who has been receiving $163 per month in gener-al assistance including a monthly shelter allowance of $90.00. Plaintiff's only source of income is from general assistance. His physical handicap has made him unable to sustain full-time employment. He leases his living quarters and has a monthly rental obligation of $120.00. Plaintiff has been informed by the Department of Social Serv-ices that his shelter allowance has been terminated effective July 1, 1980, and that his general assistance grant will be reduced to $73.00 per month reflecting the termina-tion of his $90.00 per month shelter allow-ance.

In June of 1980, Governor William G. Milliken issued an Executive Order, pursu-ant to Article V, Section 20 of the Constitu-tion of the State of Michigan, requiring a reduction of the general assistance appro-priation in the amount of $1,600,000.00 for the period from July, 1980, through Sep-tember, 1980.[1] This reduction was imple-

1. The policy which has resulted in termination of plaintiffs' general assistance shelter allow-ance was established by the governor in Execu-tive Order 1980-3 which provides: "General Assistance Grants and Payments: Payment to recipients residing in the household of another person shall be limited to personal needs."

This policy change has been incorporated into the regulations of the Michigan Depart-ment of Social Services in its General Assist-

mented by direction of the defendant, John T. Dempsey, Director of the Michigan Department of Social Services, eliminating the shelter allowance for all general assistance recipients "living in the household of another". Implementation of the policy is calculated to save the Department approximately $2.6 million within the three remaining months of the fiscal year. This reduction was ordered to take effect with the warrants issued in the first half of July, 1980.

On June 11, 1980, plaintiff received written notice of the intended termination of his shelter allowance and action on his case. On June 14, 1980, plaintiff filed a notice of request for hearing, complying with the instructions in the notice received on June 11. On June 23, plaintiff was informed that his request for a hearing to contest the termination of his shelter allowance was denied. His shelter allowance has since been terminated, effective July 1, 1980.

Other persons who have similarly been the victims of this DSS termination policy without benefit of hearing for determination of their eligibility or ineligibility under the policy change, have moved to intervene. Because their claims arise out of similar and common facts to those alleged in plaintiff's complaint, they have been permitted to intervene.

Two intervening plaintiffs have testified to their personal financial circumstances and termination of their shelter allowances under this policy. Shirley Hoag has rented a room in the home owned by Mr. and Mrs. Fred Clay for the past year and a half. She is an outpatient at a local psychiatric hospital and is psychologically unable to live alone. Her landlord has no obligation to support her and is neither financially able or willing to support her.

Susan Deurloo had been renting a room in a mobile home which she shared with a woman friend who had primary responsibilities under a lease agreement for rental of the mobile home. When the Department of Social Services terminated her shelter allowance, she was forced to leave and has been residing with her brother and sister-in-law. Her brother is similarly unable and unwilling to continue to provide housing for her. Both women requested hearings on termination of their shelter allowances and were denied the opportunity for a hearing.

Mr. Soave has been renting space from the same landlord since 1977. He and a friend, Mr. Schulte, moved to Grand Rapids, Michigan together in 1977 and shared an apartment for which Mr. Schulte had finan-

---

ance Manual in Chapter Six at page 11. The intended meaning of the policy is explained there:

"*LIVING IN THE HOME OF ANOTHER PERSON*
*General Policy*
'Living in the home of another person' has a special meaning in GA. It signifies a living arrangement where the client does not have the main responsibility to meet shelter costs for the dwelling unit. In general, a client who is not in independent living is living in the home of another person.

The following things are always true for situations where the client is living in the home of another person:

The client *does not* have an ownership or purchaser's interest in the dwelling unit.

The client *does not* have a written rental agreement or lease with the absent owner of the dwelling unit.

The client *does not* live in a commercial hotel, motel, or rooming house.
The client *does not* live in a special living arrangement.
'Living in the home of another person' situations are common. They include all instances where the client lives with the owner of the dwelling unit. The following are examples of persons living in the home of another person: an adult child living with his parents in their home; an aged parent living with her adult children in their home; two friends living in the same home, which is owned by one of them.
*Allowable Needs Items (Living in the Home of Another Person)*
The only need items that may be included in the budget of a client who is living in the home of another person are personal needs and special needs (work requirements allowances and medical transportation).
Shelter, heat, and utility allowances are *NEVER* to be included in the budget." (Emphasis in the original.)

cial responsibility under a lease. Mr. Soave subleased part of the apartment from Mr. Schulte under the terms of a written lease agreement. When Mr. Schulte purchased a home in the fall of 1977, Mr. Soave arranged to rent a room in the home and the parties entered into a lease agreement. Mr. Schulte testified that he is dependent upon the contribution of Mr. Soave to meet his own financial obligations under a mortgage. If his tenant is unable to pay his rental obligation, according to the terms of the lease agreement, he, Schulte, will be forced to evict Mr. Soave and secure another tenant.

On July 14, 1980, the plaintiff filed an amended complaint seeking a declaratory judgment that the acts complained of are unconstitutional and an injunction to prevent defendants from terminating general assistance shelter allowances under the new policy. Plaintiff brings this action and seeks relief on behalf of himself and all other general assistance recipients within the state affected by the same policy change. In addition, plaintiff seeks damages.

This case is presently before the court on plaintiff's motion for preliminary injunctive relief. In determining whether a preliminary injunction is appropriate, the court must examine the facts of the case in light of four well-established legal standards:

(1) Whether the plaintiffs have shown a strong or a substantial likelihood or probability of success on the merits;

(2) Whether the plaintiffs have shown irreparable injury absent injunctive relief;

(3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

(4) Whether the public interest would be served by issuing a preliminary injunction.

*Mason County Medical Association v. Knebel*, 563 F.2d 256 (6th Cir. 1977).

## MERITS

First, I intend to address the merits of the plaintiff's claim. The plaintiff has brought three distinct constitutional challenges to the implementation of this policy that has resulted in termination of his general assistance shelter allowance. First, the policy was effected without affording him an evidentiary hearing before the termination of his benefits and, therefore, offends the requirements of due process. The second challenge is directed to the policy itself, claiming that it uses an impermissible conclusive presumption, offending due process. In addition, the plaintiff raises equal protection challenges to the policy based on its lack of rational relationship to a legitimate purpose and failure to be justified by a compelling state interest.

The leading case on the issue of whether the due process clause requires that a welfare recipient be afforded an evidentiary hearing before the termination of benefits is *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

The Supreme Court in *Goldberg* recognized that welfare recipients generally live on the edge of poverty and require state assistance to provide basic necessities for self-survival. The Court has clearly said that when welfare benefits are terminated, only a pre-termination evidentiary hearing could satisfy the constitutional demands of due process. The conclusion of the Court turns not insubstantially on the fact that erroneous termination exacts too high a cost from the indigent individual and undermines values which as a society we seek to recognize and protect in providing assistance. The fact is that termination of aid pending resolution of a controversy over eligibility for benefits may deprive an *eligible* recipient of the very means by which to live while he awaits a determination. Where the person lacks independent resources, as do the plaintiffs presently before the court, deprivation of benefits may force the person into an immediate desperate situation. A hearing provides a safeguard against erroneous deprivation of benefits.[2]

2. The defendant relies on Rule 400.903(3) of the Michigan Administrative Code to justify the

Departments denial of a hearing to the three plaintiffs who have appeared before the court.

It is clear from the testimony to date, that the plaintiff and each of the intervening plaintiffs at the time of termination of their shelter allowances lived in the household of another and shared the household with a person who had the primary obligation either under a mortgage or a lease agreement. Consequently, they have failed to show that if they had been provided a hearing before termination of their shelter allowance, an impartial hearing examiner would have found they were improperly included within the class established by the policy.

The real nature of the claim raised by these plaintiffs goes to the policy itself. They claim that the termination of benefits with or without a hearing is improper. The policy operates by use of an "irrebuttable presumption" that persons living within the household of another can be financially provided for by the person in whose household they live. While this factual presumption conceivably may be true for some or even many of the 20,000 general assistance recipients placed within this classification by the department, it is not true for the plaintiffs in this lawsuit. Consequently, the policy is overinclusive.

The State of Michigan is confronted with a serious financial crisis brought on by an increasing downturn in the economy. The economy of the state is directly related to the general health of the automobile industry. The state has suffered substantial losses of revenue as a result of high unemployment, primarily in the automobile and related industries. At the same time, high unemployment has generated a substantial increase in the number of general assistance cases within the past ten months. In October of 1979, at the beginning of the state's fiscal year, it was projected that the Department of Social Services would have 50,000 general assistance cases within fiscal 1980 and appropriations were made based on that projection. The present caseload includes 85,000 to 87,000 cases. Supplemental appropriations have been passed to make up the shortfall in the department's budget and substantial program reductions have been implemented within the department.

The interests of the state in maintaining fiscal responsibility in its expenditures and in effecting reductions where actual revenues fall short of the demands for funding programs at existing levels is a serious and important governmental interest. There is no question that fiscal integrity compels reduction of expenditures under the circumstances facing the State of Michigan. The difficult question which confronts this court is whether the Governor and the Department have chosen an acceptable way to reduce expenditures.[3] The plaintiffs do not challenge the Department's authority to re-

This section provides:

"(3) A hearing shall not be granted when either state or federal law requires automatic grant adjustments for classes of recipients, unless the reason for an individual appeal is incorrect grant computation."

The distinction that this rule employs between factual error and policy error may or may not be proper justification for refusing to provide a hearing for a general assistance recipient upon termination of benefits. *See, Yee Litt v. Richardson*, 353 F.Supp. 996 (N.D.Cal.), *aff'd sub nom, Carleson v. Yee Litt*, 412 U.S. 924, 93 S.Ct. 2753, 37 L.Ed.2d 152 (1973). However, here the facts do not warrant a discussion of the problems raised by the facts/policy distinction for purposes of ruling on a motion for preliminary injunction.

3. The court heard extensive testimony on the process of formation of this policy and its intended departmental interpretation from Allan Durkee, Director of the general assistance and emergency needs program in the Michigan Department of Social Services. Mr. Durkee's responsibilities include the development, drafting and interpretation of policies in the general assistance and emergency needs programs. According to his testimony, the policy at issue here was developed by members of the Governor's staff and staff from the Department of Social Services.

The policy was developed and implemented without benefit of any formal study. This expenditure reduction was embarked upon without any documented assessment of the impact of this termination upon recipients or any determination, if in fact the presumption upon which the policy relied (that is that the person with whom the recipients lived would provide housing at no cost to the recipients) was true.

duce expenditures or to eliminate general assistance programs.

The general assistance program exists to provide for people who are eligible for general relief and who presumably are without access to resources to provide for their basic needs.[4] The Department, when faced with the necessity of reducing expenditures, considered several alternatives for reductions within the general assistance program. It was concluded that the policy least likely to result in recipients being thrown out on the streets without shelter was that incorporated in Executive Order 1980–3, eliminating shelter allowances for persons living within households of another. In creating this policy, the Department concluded that persons sharing a household with their landlords are in a position to be provided housing by that landlord at no cost to the recipient. The policy conclusively presumes that income of a landlord is available to all persons within the class for purposes of subsidizing their shelter. Conversely, the policy also presumes that persons within this classification are not actually in need of general assistance to provide shelter for themselves.

The falsity of these unsubstantiated presumptions is illustrated by the situations of those persons who have appeared in this action as plaintiffs. The landlords of the plaintiffs expect and rely on the financial contribution of their tenants to meet their own mortgage and rental obligations. In the absence of a rental contribution from their tenants, the landlords will be forced to evict these people and secure other renters

to enable them to meet their primary financial obligations. Ms. Deurloo has already been evicted from her home. Ms. Hoag and Mr. Soave have remained in their homes at the sufferance of their landlord pending resolution of this matter. The fact that a general assistance recipient is sharing living space with a person who owns or leases the house or apartment in which they live seems to have no rational relationship to the actual need of the recipient.

Presumably some of the 20,000 persons in this class affected by this policy are living with family members, either adult children living with their parents, or parents living with their adult children. It might well be rational for the Department and Governor to realign the classification and to adopt procedures to identify those instances where general assistance recipients residing in the home of family members actually can be provided housing by those family members. The court, however, has absolutely no idea how many persons receiving general assistance fall within this category. Without such information, it is impossible for the court to determine if there is any thread of rational relationship between the policy and its articulated purpose. In the absence of any demonstration by the state that there are persons who fall within this sub-category, the court concludes that the classification is arbitrary, unreasonable and irrational and, therefore, not entitled to the deference which the court has traditionally paid to social and economic policies established by states. *See, Dandridge v. Williams*, 397

4. The general assistance program is a state-funded program with a budget for the fiscal year of 1980 of $1.36 billion allocated from the state's general fund and matched by an equal amount of federal funds. The program is established in the Social Welfare Act, M.C.L.A. 400.1, *et seq.* Under M.C.L.A. 400.18(1), authority is delegated to the Department of Social Services to provide for distribution of the monies appropriated by the legislature for general assistance. Statutory criteria for determining eligibility for general assistance is set forth in M.C.L.A. 400.55a. The policies and regulations which govern the program are found in the General Assistance Manual published by the Department of Social Services.

The plaintiffs have raised a claim under the Michigan Administrative Procedures Act (M.C.L.A. 24.201, *et seq.*) claiming that this change in the general assistance policies was not properly adopted under the provisions for adoption of rules under M.C.L.A. § 24.241. I do not comment on the merits of that pendent state claim. For purposes of the motion for preliminary injunction presently before me, it is sufficient to determine that the plaintiffs have established a clear and substantial likelihood of success on the merits in their due process challenge to the policy change. This challenge goes directly to the constitutional acceptability of the policy regardless of whether it was or was not properly adopted under procedures established by the state legislature.

U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

Defendants have suggested that if Mr. Soave were to secure independent housing for himself, he would continue to qualify for a general assistance shelter allowance under the "independent living" classification. Admittedly, any independent shelter that he would secure would be at a greater cost to the Department than his most recent $90.00 a month shelter allowance. In implementing this policy, the Department has assumed that many recipients will silently accept the cutoff of their shelter allowance without challenge or objection. However, the Department anticipates that many members of the class who are truly dependent on general assistance for shelter will be forced to seek independent housing at a greater cost to the Department as a result of this policy. No rationale has been offered for forcing otherwise eligible general assistance recipients out of their existing homes into independent living at a greater cost to the state. This collateral effect of the policy certainly does not contribute to the goal of reducing general assistance expenditures. Nor does it assure the continued effectuation of the major and essential purpose of the general assistance program—that is, to provide assistance for the needy.

In *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the court struck down the Illinois statutory irrebuttable presumption that all fathers of illegitimate children were unqualified to provide care for their children. The Supreme Court found that the use of this presumption of unfitness without an opportunity for a hearing to establish the fact of fitness offended due process. In striking down the use of the presumption on due process grounds, the Court said:

> "(I)t may be argued that unmarried fathers are so seldom fit that Illinois need not undergo the administrative inconvenience of inquiry in any case, including Stanley's. The establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest

worthy of cognizance in constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones.

> "Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand." (Footnotes omitted.)

■ Similarly, I have difficulty concluding that without the benefit of a hearing, without witnesses, and without findings of fact, the Department can assume that persons living within the household of another are not in fact in need of general assistance to secure housing for themselves. Due process requires individualized determination of actual absence of need or availability of resources from third parties before general assistance is terminated on the basis of lack of need. (*See, Goldberg v. Kelly, supra.*) The simple assumption of lack of need here is not sufficient. Under the presumption utilized by the Department, it does not matter if the household in which the recipient lives is itself on the brink of poverty, or if there has been actual support from the landlord to the recipient, or if an obligation on the part of the landlord to support the tenant exists, or if, in fact, there is any availability of financial support from the income of the landlord for the needs of the recipient.

Likewise, in *Vlandis v. Klein*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), the Supreme Court struck down a Connecticut statutory scheme which created an irrebuttable presumption of nonresidence for stu-

dents, preventing students from presenting evidence to show that they were in fact bona fide residents of Connecticut for purposes of qualifying for reduced in state tuition at the state universities. Under the Connecticut scheme, if a married student had an out-of-state address at the time of application for admission, or if a single student resided outside of the state at any time during the year immediately preceding his application for admission, that student was presumed to be a non-resident student. The student maintained that determination of non-resident status during the entire course of his attendance at the state university.

The Court found that the rigid application of this presumptive rule operated to defeat the state's articulated purpose of providing lower tuition rates for its residents. It concluded that the irrebuttable presumption of non-residence, violated due process because it was arbitrary, unreasonable and not necessarily or universally true in fact and that the state had alternative means of making a factual determination of residency or non-residency. *Vlandis, supra,* at 452–453, 93 S.Ct. at 2236–2237.[5] The requirements of due process were found to require that a resident be granted an opportunity to present evidence that he is in fact a resident of Connecticut. The Court directed the state to re-establish its criteria for residency if it sought to continue to protect its articulated interests.

In *U. S. Dept. of Agriculture v. Murry,* 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973), the Court struck down a provision of the federal food stamp program which made the entire household ineligible for food stamps if it included a member who was 18 years or older and had been claimed as a dependent for federal income tax purposes by a taxpayer not in the household. The statutory provision was enacted to prevent fraudulent claims by non-needy households for participation in the food stamp program. The Court found that the section offended due process because it created a conclusive presumption that the household was not needy and in fact had access to adequate nutrition. The factual circumstances of the plaintiffs demonstrated to the Court that the presence of a claimed tax dependent in the household did not in fact operate as an accurate or rational measure of the actual need of the dependent himself or of the household in which he lived. The Court, relying on *Vlandis v. Klein, supra,* and *Stanley v. Illinois, supra,* found the policy rested on a irrebuttable presumption which was often contrary to fact and was, therefore, lacking in critical ingredients of due process.

In the case before the court, the rational touchstone for eligibility for general assistance programs is established need. The fact that a recipient resides with his landlord is not a rational or accurate measure of the need of that recipient for assistance to enable him to provide shelter for himself. I conclude that it is irrational to assume that a person is not in need of general assistance simply because he resides with another person to whom he pays rent. The irrebuttable presumption employed by the state in its recently implemented policy is often contrary to fact, overinclusive, and neither rational nor reasonable. It consequently offends the requirements of due process of the Fourteenth Amendment. *United States Department of Agriculture v.*

---

5. In *Vlandis,* the Court said, at 452, 93 S.Ct. at 2236:

> "In sum, since Connecticut purports to be concerned with residency in allocating the rates for tuition and fees in its university system, it is forbidden by the Due Process Clause to deny an individual the resident rates on the basis of a permanent and irrebuttable presumption of nonresidence, *when that presumption is not necessarily or universally true in fact, and when the State has reasonable alternative means of making the crucial determination.* Rather, standards of due process require that the State allow such an individual the opportunity to present evidence showing that he is a bona fide resident entitled to the in-state rates. Since § 126 precluded the appellees from ever rebutting the presumption that they were nonresidents of Connecticut, that statute operated to deprive them of a significant amount of their money without due process of law." (Emphasis added.)

*Murry, supra; Vlandis v. Klein, supra; Stanley v. Illinois, supra. See also, Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). To the extent that the policy is overinclusive, it operates to deprive persons on the edge of poverty of a basic necessity for survival without affording them an opportunity to show their continued need for shelter allowance assistance. It is clear that the classification used here sweeps too broadly and operates inflexibly. In focusing on the important value of reducing expenditures, the state has utilized a policy and a procedure that risks running roughshod over the rights and needs of persons on the edge of poverty.

Counsel for the plaintiffs have raised questions of the constitutional acceptability of the policy, applying both traditional equal protection analysis and strict scrutiny analysis under the equal protection clause of the Fourteenth Amendment. Having concluded that the policy offends due process by utilizing an irrebuttable presumption, and therefore should be enjoined from implementation, I see no need for the court to address the equal protection issues raised by the plaintiffs.

## IRREPARABLE HARM AND BALANCING OF EQUITIES

■ The harm to persons is sufficiently irreparable to justify the issuance of a preliminary injunction. While the state has suggested that the plaintiffs can establish independent living and thereby qualify for continued general assistance, that is neither rational nor feasible for some of the plaintiffs. Both Mr. Soave and Ms. Hoag have testified that they need to live with other persons because of medical conditions—Mr. Soave because he is subject to epileptic seizures and Ms. Hoag because her psychological instability has led her to attempt suicide on a number of occasions. It is her doctor's advice that living in a household will prevent those occasions from arising.

The issuance of this preliminary injunction restraining the Department from implementing the "living within a household

of another" exception to the general assistance shelter allowance policy clearly frustrates the efforts of the Department in reducing their general assistance expenditures. The Department, the Governor and the legislature, however, are not deterred by this injunction from establishing a policy and procedure that permits a determination of actual availability of family financial resources to provide shelter for recipients. A determination of the actual availability of other resources for shelter would form a rational basis for termination of benefits. It is the irrebuttable presumption of the availability of resources, without an actual determination at a hearing which offends due process.

The Department apparently conducted reviews by local staff of each general assistance case to determine if in fact recipients fell within the class of persons "living within the household of another." The administrative costs of determining actual availability of shelter assistance could have been, and no doubt still can be, sustained by the department. The costs of such an administrative determination would be outweighed by long-term savings incurred by the program change. In any event, the Department has not introduced any evidence to show that a case-by-case determination of the existence or availability of landlord subsidized housing would be prohibited because of administrative expense.

Although the public interest in reducing governmental expenditures at this time of fiscal crisis is important, the state has not shown that interest will be jeopardized by this injunction. There are alternatives available to the Department, the Governor and the legislature to serve the public interest in reduction of expenditures that do not utilize a conclusive presumption and do not offend due process.

Further, there are important societal values which we seek to recognize and protect by providing public assistance. Maintaining the personal dignity and stability of persons on the edge of poverty serves not only their personal interests, but the interests of the society in which they live.

## CONDITIONAL CERTIFICATION OF THE CLASS

■ I am satisfied, at least as a *prima facie* matter, that the prerequisites of a class action have been met and that this action should be permitted to proceed as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure. In order to effectively provide relief for the 20,000 persons affected by the departmental policy which I have today enjoined, it is necessary to conditionally certify a class. Consequently, a class is conditionally certified under Rule 23(b)(2), including all general assistance recipients who have been classified by the Michigan Department of Social Services as "persons living in the household of another", and who have had their general assistance shelter allowance terminated pursuant to Executive Order 1980–3 and the policy of the Department of Social Services adopted and implemented pursuant to that order.

A full hearing on the question of permanent certification of the class will be set within the next thirty days.

## CONCLUSION

■ For the reasons set out above, I find that the plaintiffs have sufficiently established a showing of substantial likelihood of success on the merits and have demonstrated that, in the absence of a preliminary injunction, they will suffer irreparable harm. There is no evidence from which the court can conclude that the issuance of a preliminary injunction will cause substantial harm to any others. In fact, the court concludes that substantial public interests will be served by issuance of a preliminary injunction.

## ORDER

The court having before it plaintiff's motion for preliminary injunction, joined in by the intervening plaintiffs, and having heard oral argument of the parties and read the briefs of the parties on the issues presented by the case, and having issued concurrently with this order an opinion which constitutes the findings of facts and conclusions of law

required by Rule 52 of the Federal Rules of Civil Procedure; now, therefore,

IT IS HEREBY ORDERED that a plaintiff class is conditionally certified in this action. The members of the class shall include: all general assistance recipients who have been classified by the Michigan Department of Social Services as "persons living in the household of another", and who have had their general assistance shelter allowance terminated pursuant to Executive Order 1980–3 and the policy of the Department of Social Services adopted and implemented pursuant to that order.

IT IS FURTHER ORDERED that the defendants William G. Milliken, Governor of the State of Michigan, and John T. Dempsey, Director of the Michigan Department of Social Services, and all persons employed by the Michigan Department of Social Services, are hereby enjoined from implementing the provisions of Executive Order 1980–3, which affects the expenditures and policy of the Department of Social Services general assistance grant program and terminates the payment of general assistance shelter allowance to recipients "living in the household of another person". The defendants are enjoined from implementing any Department of Social Services policy for the purpose of terminating general assistance shelter benefits, which incorporates the same presumption which the court has found in its opinion of this date to be an overinclusive, irrebuttable presumption that offends the due process clause of the Fourteenth Amendment of the United States Constitution.

IT IS FURTHER ORDERED that defendant, John T. Dempsey, shall forthwith notify all general assistance recipients who have been classified by the Michigan Department of Social Services as "persons living in the household of another" and who have had their general assistance shelter allowance terminated pursuant to Executive Order 1980–3 and the policy of the Department of Social Services adopted and implemented under that order, that their general assistance shelter allowance benefits are reinstated; and shall forthwith re-

instate general assistance shelter allowance benefits to members of the class, without regard to the policy which the court has struck down in its opinion of this date, as of the date of this order.

This injunction shall continue pending resolution of this case on its merits or until further order of this court.

Douglas W. Hillman
District Judge

Dated: July 31, 1980.