Luella WHITFIELD, et al., Plaintiffs,

v.

John T. DEMPSEY, Director of the Michigan Department of Social Services, Defendant.

No. K82–03 CA9.

United States District Court, W. D. Michigan, S. D.

Feb. 9, 1982.

Edward J. Hoort, Michigan Legal Services, Detroit, Mich., Legal Aid of Calhoun County, William P. Battiste, Jr., Battle Creek, Mich., Legal Aid of Western Michigan, Gary Gershon, Grand Rapids, Mich., Legal Services Organization of Southcentral Michigan, William L. Coash, Battle Creek, Mich., for plaintiffs.

Janis Meija and Robert Rosenberg, Asst. Attys. Gen., Lansing, Mich., for defendant.

## OPINION

BENJAMIN F. GIBSON, District Judge.

This case involves equal protection and due process challenges to Michigan's most recent amendment to the eligibility requirements for receipt of General Assistance ("GA"). Plaintiffs seek to enjoin termination of GA benefits as to those persons affected by the new policy. For the reasons which follow, this Court is of the opinion that the relief requested should be denied.

The criteria for issuance of a preliminary injunction are well-established in this circuit. Plaintiffs are required to show: (1) irreparable injury should an injunction not issue, (2) that they have a substantial likelihood or strong probability of success on the merits, (3) that others would not be subjected to substantial harm, and (4) that the public interest will be served by issuance of a preliminary injunction. *Mason County Medical Ass'n. v. Knebel,* 563 F.2d 256 (6th Cir. 1977); *Roth v. Bank of Commonwealth,* 583 F.2d 527 (6th Cir. 1978), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979). The first two elements are the areas of primary dispute under the facts and circumstances of this case. It is plaintiffs'

inability to demonstrate the probability of success on the merits upon which this Court rests its opinion.

The State of Michigan is presently facing severe economic difficulties. As of December, 1981 there were 115,000 GA recipients and the number is increasing daily due to rising unemployment. During the later part of 1981 Governor Milliken exercised his power pursuant to Article V, § 20 of the Michigan Constitution to reduce expenditures authorized by prior appropriations. On October 22, 1981 he issued Executive Order 1981–9 which targeted the Department of Social Services' budget for a total reduction of $152,000,000.00. A portion of this amount was to be trimmed from the GA program by reducing benefits an additional 6%, to a total of 11%. In addition, § 14 of 1981 Public Act No. 35 was to be modified.[1] It is this modification which plaintiffs challenge.

The amendment to § 14 represents the third time that Michigan has targeted welfare reductions at those who are involved in "J Living Arrangements."[2] Effective January 1, 1982 it was to contain the following language:

IT IS ALSO REQUIRED THAT ALL PERSONS LIVING IN A COMMON DWELLING UNIT WHO ARE RELATED BY BLOOD, MARRIAGE OR ADOPTION SHALL BE CONSIDERED A SINGLE HOUSEHOLD FOR PURPOSES OF ELIGIBILITY FOR GENERAL ASSISTANCE. The Department shall develop an exception policy based on disability.

Beginning in November, 1981 all GA recipients within the class were twice notified that all benefits would be terminated as of January 1, 1982. Termination could be stayed (a) if the entire household applied for assistance, (b) pending determination of disability or (c) if a hearing was requested to resolve a factual issue.

---

1. 1981 Public Act No. 35 is the 1981–1982 appropriation for Social Service programs. Section 14 of the Act provided for a rebuttable presumption that a GA recipient living in the home of another had no shelter costs.

2. A "J Living Arrangement" means that a GA recipient is living in the household of another. For explanation of the first and second attempts to reduce benefits payable to this class see *Soave v. Milliken,* 497 F.Supp. 254 (W.D. Mich.1980) and n.1, *supra.*

Plaintiff Whitfield lives with her niece and four children. She pays her niece a monthly rental of $60.00, covered by the GA shelter allowance. It is not disputed that the entire household does not presently qualify for assistance because the niece is receiving sick pay benefits from her employer. Nor is it disputed that if either Whitfield or the niece are later determined to be disabled, the new GA policy will not apply to them. Whitfield's benefits will be terminated under the new policy unless she is granted an exemption.[3]

The Department of Social Services ("DSS") has recently been faced with a dilemma in attempting to reconcile the demands of the needy with decreasing state revenues. As the problem worsens, it has attempted to grant GA benefits to those who are the most needy. A survey conducted by DSS showed from 60–65 percent of GA recipients involved in "J Living Arrangements" were renting rooms from relatives. Of this total, 70% are children, 2% are parents, 16% are siblings, 5% are nieces or nephews, 2% are grandchildren, 3% are cousins, 1% are spouses and 1% are aunts or uncles. The new DSS policy terminates the benefits of these recipients unless 1) the recipient or landlord was disabled, 2) the recipient could show that he was, in fact, not related to the landlord or 3) the entire household qualified for GA.

■ Plaintiffs contend that the new policy violates the equal protection and due process clauses of the fourteenth amendment. More specifically, they contend that DSS has established an irrebuttable presumption that those who live with relatives will be supported by them. The Supreme Court has recognized that social welfare schemes, by their very nature, involve categorizing people and drawing lines to determine eligibility for benefits. *Califano v. Aznavorian*, 439 U.S. 170, 99 S.Ct. 471, 58 L.Ed.2d 435 (1978). It has adopted a policy of giving deference to state officials who

are charged with the responsibility of allocating welfare benefits. *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Consistent with that policy, programs adopted by state officials are to be judged by whether they are rationally related to underlying objectives. This is true whether the programs are challenged on either due process or equal protection grounds. *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960); *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Richardson v. Belcher*, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Mathews v. Lucas*, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976). Since there is no fundamental constitutional right to receive GA benefits an irrebuttable presumption analysis is not appropriate. DSS must only refrain from invidious discrimination, a contention not argued in this case. *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Jackson v. O'Bannon*, 633 F.2d 329 (3rd Cir. 1980).

The evidence showed that several alternatives were considered for meeting the necessary reductions: 1) to increase the ratable reduction[4] from 5 to 23 percent and 2) to reduce personal and terminate shelter allowances for employable persons. The first alternative was rejected as impacting too greatly on those most in need. The alternative was determined to be unrealistic considering Michigan's adverse employment conditions. In fact, it is the growing unemployment which is increasing the welfare rolls and concurrently decreasing state revenues.

■ After much deliberation, it was determined that the policy adopted by the Executive Order was the most appropriate to reduce welfare expenditures and, at the same time, minimize the effect upon those persons most unable to assist themselves. While the new policy does tend to assume that relatives would be *willing* and *able* to

---

3. Whitfield has sought exemption from the Executive Order by a claim of disability which is pending before the Department of Social Services.

4. A ratable reduction is a percentage decrease in benefits which is applied to all recipients.

## 770

provide support, it appears, at least tentatively, that these assumptions have been confirmed.

In the event that a relative landlord is unwilling or unable to assist the recipient, he is not without recourse. The new policy provides that any GA recipient adversely affected may elect to leave the relative's residence. The recipient is given two months to establish himself in an independent living arrangement which would result in continuation of his benefits. This could actually result in an increase in the recipient's shelter allowance if the landlord relative was charging less than the maximum benefit. Concern has been expressed that the GA recipient may not be able to locate housing identical to that which he had previously causing him hardship. However, the law does not require that the result of a welfare policy be perfect. *Dandridge v. Williams*, 397 U.S. 471, 475, 90 S.Ct. 1153, 1156, 25 L.Ed.2d 491 (1970). In fact, if a recipient finds the market rate for shelter costs to be higher than that paid to the relative landlord, this factor tends to confirm DSS's assumption that the relative was providing some support. In any event, exercising the option to move would place this class of GA recipients in no different financial position than those who are not living with relatives.

The Executive Order[5] is premised also upon the assumption that if, in fact, in cases where the landlord relative is unable to provide support, the entire household would qualify for GA assistance. Under any set of circumstances, it is anticipated that those who are legitimately in need of assistance will receive it.

In reaching the conclusion that the Executive Order is not unreasonable the Court takes note that 89% of the GA recipients affected by the new policy are either children, parents, siblings, or spouses of the relative landlord. To date, some 14,000 GA recipients have been terminated. DSS estimates that relatively few of these persons will have their benefits reinstated under the new eligibility requirements. This gives credence to DSS's assumption that relatives, for the most part, will be able or willing to provide support. In cases where the assumption does not hold true, the affected GA recipient has the option of seeking alternative housing with a non-relative for continued benefits.

Accordingly, the Court believes that the new policy is not violative of either the equal protection or due process clauses of the Constitution. Plaintiffs have failed to show a substantial likelihood or strong probability of success on the merits. This makes it unnecessary for the Court to consider whether plaintiffs will suffer irreparable harm or the other criteria necessary for the issuance of a preliminary injunction.

In refusing to issue an injunction enjoining the implementation of the Executive Order and in deciding that plaintiffs have failed to establish a likelihood or probability of success on the merits, the Court *does not* decide that plaintiff Whitfield or those other 14,000 persons who may be in a similar situation do not need assistance. The primary responsibility of determining who shall be eligible for assistance is for the State of Michigan. Federal Courts will ordinarily not interfere with that determination unless there are violations of constitutional proportions. The standards to be used to determine whether, in fact, there are such violations give the Court very narrow latitude. The Court is further restricted by the undisputed current financial crisis facing the State of Michigan. The Court must recognize that the limitation of resources available for welfare purposes has mandated that the State determine priorities. Michigan has so determined that the policy set forth in the Executive Order is one calculated to do the least harm. This is not to say that those recipients would not be harmed or disadvantaged to some degree. Given the alternatives facing the State, the Court cannot say that the policy adopted impaired the constitutional rights of the plaintiffs.

5. Cognizant of the fact that the Executive Order itself is not being challenged, the Court merely uses this label to refer to the underlying policy at issue.

Accordingly, the petition of the plaintiffs for injunctive relief is denied.

IT IS SO ORDERED.